T.C. Memo. 1998-35


UNITED STATES TAX COURT


ESTATE OF EMANUEL TROMPETER, DECEASED, ROBIN CAROL TROMPETER
GONZALEZ AND JANET ILENE TROMPETER POLACHEK, CO-EXECUTORS,
 Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent.


Docket No.  11170-95.              Filed January 27, 1998.


        D died on Mar. 18, 1992, and his Federal estate
tax return reported the value of his estate (E) on the
alternate valuation date.  R determined higher values
for many of the reported assets, assigned values for
unreported assets, and disallowed certain deductions.
R also determined that E was liable for the fraud
penalty under sec. 6663(a), I.R.C.  <u>Held</u>: Taxable
estate redetermined, including redeterminations of fair
market value.  <u>Held</u>, <u>further</u>, E is liable for the fraud
penalty.

Robert A. Levinson, Avram Salkin, Bruce I. Hochman, Charles P. Rettig, and Frederic J. Adam, for petitioner.

Irene Carroll, Anne E. Daugharty, Linette Angelastro, and Donald E. Osteen, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  This case is before the Court pursuant to a petition filed on behalf of the Estate of Emanuel Trompeter (the estate) to redetermine respondent's determination of a $22,833,693 deficiency in Federal estate tax and a $14,875,909 fraud penalty under section 6663(a).  Respondent determined, as an alternative to the fraud penalty, that the estate is liable for an accuracy-related penalty for negligence and gross valuation misstatement under section 6662.

Following concessions, the primary issue that the Court must decide is the September 18, 1992, fair market value of the following assets which the parties agree are included in the gross estate of Emanuel Trompeter (the decedent):

1.  1,533.482 shares of Sterling Holding Co. (Sterling) series A exchangeable preferred stock (Sterling preferred stock). We hold that the applicable value (including accrued dividends) is $1,974,845.

2.  Two hundred twenty seven rare gold coins.  We hold that the applicable value is $8,129,523.

The Court also must decide the following secondary issues:

1.  Whether the decedent's gross estate includes $14 million of diamonds, jewels, gems, art, and artifacts that were not reported on his Federal estate tax return.  We hold that his gross estate includes $4.5 million of these assets.

2.  Whether certain other items determined by respondent to be included in the decedent's gross estate are so included.  We hold they are to the extent and in the amounts stated herein.

3.  Whether Sylvia Trompeter (Ms. Trompeter) had a bona fide claim against the estate because the decedent, her former husband, failed to disclose the value and extent of his coin holdings during their divorce proceeding.  We hold she did not.

4.  Whether the estate is liable for the fraud penalty determined by respondent under section 6663(a).  We hold it is.[1]

Unless otherwise stated, all section references are to the applicable provisions of the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded to the nearest dollar.  The term "co-executors" refers collectively to the estate's coexecutors, Robin Carol Trompeter Gonzalez (Ms. Gonzalez) and Janet Ilene Trompeter Polachek (Ms. Polachek).

---

[1] On account of this holding, we do not decide the alternative determinations under sec. 6662.

FINDINGS OF FACT

I.   Overview

Some of the facts have been stipulated and are so found. The stipulations and the exhibits submitted therewith are incorporated herein by this reference. The decedent was born in New York on February 22, 1919, and he resided in Thousand Oaks, California, when he died on March 18, 1992. At the time of the filing of the petition, Ms. Gonzalez resided in Florida, and Ms. Polachek resided in California.

The coexecutors are the decedent's sole beneficiaries and his only surviving children. Their mother is Ms. Trompeter. Each coexecutor is college educated, has extensive work experience, and knows about her obligation to file valid Federal tax returns. The coexecutors enjoy a close and friendly relationship with Ms. Trompeter.

The coexecutors are cotrustees of the Emanuel Trompeter Trust (the Trust), a trust that holds most of the decedent's assets. The Trust was revocable during the decedent's life, and the decedent was its sole trustee until Ms. Gonzalez became cotrustee with him in September 1991. Ms. Polachek became a cotrustee with Ms. Gonzalez following the decedent's death.

II.  The Decedent's Sale of Trompeter Electronics, Inc. (TEI)

In 1960, the decedent and Ms. Trompeter formed TEI. TEI manufactured mainly electronic components which assisted in the

guidance system of air to ground missiles.  TEI also manufactured components used in the television industry.

In March 1989, Sterling, a private company with a calendar yearend, acquired all TEI stock in a leveraged transaction in which the decedent and Ms. Trompeter received approximately $14 million in cash and 3,000 shares of a newly issued Sterling preferred stock.  These shares were the only shares of this type of preferred stock that Sterling issued, and holders of these shares were generally entitled to more rights than holders of Sterling's other preferred shares.  Of the 3,000 shares of Sterling preferred stock received by them, the decedent received 1,533.482 shares and Ms. Trompeter received the rest.  Holders of Sterling preferred stock were entitled to receive "preferential dividends" on the liquidation value of the stock, when and as the dividends were declared by Sterling's board of directors, and they were entitled to certain preferences in the event of liquidation.  Preferential dividends accrued daily at the annual rate of 8.5 percent through the end of 1989, 9.83 percent during 1990, 11.17 percent during 1991, and 12.5 percent from the beginning of 1992 through the date on which the Sterling preferred stock was either redeemed or exchanged.  To the extent that the dividends were not paid on January 15 of each year, beginning January 15, 1990, all dividends which had accrued on each share then outstanding would be added to the liquidation

value of that share and would remain a part thereof until the dividends were paid.  The decedent and Ms. Trompeter were entitled, subject to minimal restrictions, to exchange their Sterling preferred stock for Sterling's 8-1/2 percent/12-1/2 percent subordinated debentures due December 31, 1995.

At designated intervals, Sterling was required by the purchase agreement (the purchase agreement) underlying the Sterling preferred stock to redeem shares of the stock at $1,000 per share plus accrued dividends.[2]  Sterling had to use its "best efforts" to redeem 1,000 shares of the Sterling preferred stock on December 31, 1991, and another 1,000 shares on December 31, 1992.  Sterling had a mandatory obligation to redeem 1,000 shares of the Sterling preferred stock on each December 31, 1993 through 1995.  Redemptions and payments of dividends were prohibited during any period of default on Sterling's senior debt. Redemptions and payments of dividends were also prohibited by provisions set forth in Sterling's senior debt and senior subsidiary debt agreements.  These provisions generally tied a redemption to Sterling's profitability as shown in its consolidated income statement.  Sterling's 1990 through 1992

---

[2] The number of shares to be redeemed from each holder of Sterling preferred stock would equal the product of the total number of shares of Sterling preferred stock redeemed on that date multiplied by a fraction.  The fraction's numerator equaled the total number of shares of Sterling preferred stock then held by that holder.  The fraction's denominator equaled the total number of shares of Sterling preferred stock then outstanding.

consolidated income statements, which were part of those years'
financial statements which were audited and discussed without
qualification by Sterling's independent auditor, listed the
following information:

|  | 1990 | 1991 | 1992 |
|---|---|---|---|
| Net sales | $21,801,718 | $20,528,033 | $21,777,553 |
| Cost of sales | 10,714,187 | 10,901,822 | 11,023,910 |
| Gross profit | 11,087,531 | 9,626,211 | 10,753,643 |
| Selling, general & administrative expenses | 5,111,078 | 4,782,155 | 4,639,865 |
| Amortization of goodwill & other intangible assets | 3,493,354 | [1]6,089,709 | 1,798,837 |
| Operating income (loss) | 2,483,099 | (1,245,653) | 4,314,941 |
| Other income (expense): Amortization of deferred financing costs: | (448,855) | (448,855) | (460,522) |
| interest expense | (4,089,050) | (3,557,997) | (3,003,309) |
| interest and other income | 157,973 | 45,661 | 26,360 |
| Total other expense | (4,379,932) | (3,961,191) | (3,437,471) |
| Income (loss) before income taxes | (1,896,833) | (5,206,844) | 877,470 |
| Provision for income taxes | - 0 - | - 0 - | - 0 - |
| Net income (loss) | (1,896,833) | (5,206,844) | 877,470 |

[1]Includes $2,953,646 of amortization for a noncompetition agreement that was writtenoff on account of the death of a party thereto.

No dividends were paid on the Sterling preferred stock from
its issuance through September 18, 1992, and no shares were
redeemed during that time.  Sterling had a positive cash-flow and
was timely paying interest and principal on its senior debt.
Sterling also was paying its monthly operating expenses.
Sterling had postponed paying interest and/or principal on some

of its liabilities which otherwise were due. These postponements were done with the consent of the relevant creditor(s).

When the decedent died, the Trust held 1,533.482 shares of Sterling preferred stock. On the decedent's Federal estate tax return, the estate reported the applicable value of each share at $10 and the total value at $15,335. Approximately 13 months after the date of valuation, Sterling informed its shareholders that it was proposing to refinance and redeem the Sterling preferred stock in accordance with the purchase agreement. In order to secure the refinancing, Sterling proposed to redeem each share of the Sterling preferred stock at $1,000, plus, in lieu of the accrued dividends, 5-percent interest from the time that each share was issued until the time that it was redeemed. On January 17, 1994, after Ms. Trompeter and the coexecutors had agreed to Sterling's redemption proposal, Sterling paid the Trust $1,947,845 in redemption of the 1,533.482 shares. Of the $1,947,845 amount, $414,363 was for "interest".

At the time of the leveraged transaction, the California Franchise Tax Board (CFTB) was auditing TEI's State tax liability. In connection therewith, the decedent and Ms. Trompeter agreed to indemnify Sterling equally for: (1) Any tax, penalty, or interest arising from the audit, and (2) any other tax liability of TEI that related to the period ending on or before a stated date. Estimated amounts for these liabilities

were $3.3 million and $700,000, respectively.  In order to have funds available to pay these liabilities, and to ensure performance of certain noncompetition agreements, the decedent and Ms. Trompeter agreed to place their Sterling preferred stock and certain Government bonds into an escrow account.  On March 17, 1989, the decedent and Ms. Trompeter transferred a total of $4 million into an escrow account at City National Bank (CNB).  Eleven days later, they transferred their Sterling preferred stock into the account.  The decedent's cash of $1,986,607 and his Sterling preferred stock were kept in a subaccount that CNB maintained solely for his benefit, and Ms. Trompeter's cash of $2,013,393 and her Sterling preferred stock were kept in a separate subaccount at CNB that was maintained for her.  The escrow agent was required to pay any claim that was submitted to the agent upon settlement of the aforementioned liabilities.  Ms. Trompeter could withdraw certain amounts of the cash from her subaccount before the agent paid the liabilities, as could the decedent with respect to the cash in his subaccount.

In early 1993, settlement was reached regarding TEI's liability to CFTB.  On April 5, 1993, Ms. Gonzalez, on behalf of the Trust, and Ms. Trompeter directed CNB to disburse funds from the respective subaccounts to pay CFTB the amount of the settlement.  Ten days later, CNB paid $3,077,100 out of the

escrow to CFTB.  Of this amount, $1,538,550 was paid on behalf of the Trust, and $1,538,550 was paid on behalf of Ms. Trompeter. Because the cash in Ms. Trompeter's subaccount totaled only $1,423,772, the coexecutors authorized payment of the $115,266 shortage[3] out of the decedent's subaccount.

## III.  The Decedent's Coin Collection and Other Assets

The decedent learned that he had terminal cancer sometime in the early part of 1991.  Attempting to place his affairs in order, the decedent initiated the sale of his most valuable asset, a proof gold coin collection.[4]  The decedent had collected gold coins for at least 20 years and, before his death, he was a nationally known coin collector who owned many rare gold coins and some silver coins.  The "Trompeter Collection", as it was known in the coin world, was the decedent's premier gold coin collection, consisting of 400 gold coins from the 19th and early 20th century.  One hundred and ninety one of these coins (the 191 coins) consisted of the following:

1. $5 Liberty Head gold pieces (Half Eagles) from 1858-1907;
2. $5 Indian Head gold pieces (Half Eagles) from 1908-1915;

---

[3] We recognize that $1,538,550 minus $1,423,772 equals $114,778, and that there is a $488 discrepancy.  The parties have not explained this discrepancy.  Because the parties refer to the shortage as $115,266, we do likewise.

[4] The term "proof" describes the special minting process for certain coins designed to be issued as gifts to dignitaries or sold at a premium to collectors.

3.  $10 Liberty Head gold pieces (Eagles) from 1858-1907;
4.  $10 Indian Head gold pieces (Eagles) from 1907-1915;
5.  $20 Liberty Head gold pieces (Double Eagles) from 1850-1907;
6.  $20 Saint Gaudens gold pieces (Double Eagles) from 1907-1915;
7.  The Amazonian Set, consisting of six coins; and
8.  Various patterns[5] of $5, $10, and $20 gold pieces.

The remaining coins in the Trompeter Collection were primarily $1, $2-1/2, $3, and certain pattern gold coins.

The decedent had diligently obtained each coin in the Trompeter Collection, often piece by piece, and his collection was one of a kind.  The collection included a coin in every denomination and in every year that a proof gold coin had been minted by the U.S. Mint, with the exception of one coin, and almost every proof coin in the Trompeter Collection was one of a limited number of proof coins that had been minted for that year and one of a minuscule number of proof gold coins that still were in existence.  The decedent divided the Trompeter Collection into two parts and consigned both parts to an auction house named Superior Stamp & Coin Co. (Superior) with instructions to sell the coins at auction in return for his paying it a commission of 7.5 percent of the gross proceeds.  The decedent dealt mainly

---

[5] Patterns are pieces that are minted not for general circulation, but to determine if the coin, as made, would be acceptable for general usage.

with Ira M. Goldberg (Mr. Goldberg), who was a part owner of Superior and its primary manager.

In order to determine a coin's market value, the coin generally must be graded on a scale from 1 to 70. Uncirculated coins are graded at between 60 and 70, and grade differences of one point for uncirculated coins may account for percentage differences in value of 50 percent or substantially more. Every increase in grade above a 62 increases the value of the coin dramatically, and the difference in value between a coin that is graded a 62 and a coin that is graded a 63 is material. An escalation in value is most apparent when the grade increases above 63.

Beginning in April 1991, the decedent began grading each coin in the Trompeter Collection in preparation for the auction, and he began assigning each coin a value and reserve price; the reserve price is the lowest amount at which a coin may sell at auction. The decedent was assisted in this process by Mr. Goldberg. Both Mr. Goldberg and the decedent were experienced in grading and pricing gold coins. The decedent, in particular, had been grading gold coins for at least 20 years. Of the 400 coins in the Trompeter Collection, the decedent graded 174 according to the 70 point grade scale mentioned above, and he graded each of the remaining 226 coins as either "proof", "general proof", "choice proof", or "general to choice proof". The decedent did

not assign a number grade to any of the remaining 226 coins. The
following chart shows the number of coins that received each
grade from the decedent:

| Grade | Number of Coins |
|---|---|
| 60 | 13 |
| 63 | 38 |
| 64 | 73 |
| 65 | 50 |
| Proof | 1 |
| General proof | 132 |
| Choice proof | 56 |
| General to choice proof | 37 |
| Total | 400 |

Superior proposed to sell the Trompeter Collection in two
auctions, the first of which it held on February 25, 1992.
Superior auctioned 209 of the 400 coins in the Trompeter
Collection for sale at the first auction, and there was a high
demand in response thereto.[6] Two hundred and one of the 209
coins auctioned for sale sold for the total amount of $3,850,622.
Approximately $2,628,730 of the gross proceeds was attributable
to the decedent's proof coins which he had valued at $2,598,000.

Shortly after the first auction concluded, Superior began
preparing a catalog of the 191 coins for sale at the second
auction which was scheduled for October 13, 1992. The decedent
had graded many of these coins as either general proof, choice

---

[6] The 209 coins auctioned for sale at the first auction did
not include any of the 191 coins mentioned above.

proof, or general to choice proof, and he had calculated that the total value of these coins was $7,635,000 as of July/August 1991.

The decedent died on March 18, 1992.  Shortly thereafter, Mr. Goldberg asked two independent grading services, Professional Coin Grading Service (PCGS) and Numismatic Grading Co. (NGC), to grade the 191 coins.  Contrary to the decedent's expressed views, Mr. Goldberg believed that the 191 coins would realize more at auction if they were graded by an independent grading service. In March 1992, PCGS graded all 191 coins, but for the 6-piece Amazonian set and three other coins which PCGS refused to grade, and PCGS encapsulated the graded coins into a tamper-proof plastic container.  One month later, all 191 coins, but for the 6-piece Amazonian set, were graded by NGC after NGC had removed the coins from their containers.  The following chart shows the number of coins that received each grade from PCGS and NGC:

| Grade | Number of Coins--PCGS | Number of Coins--NGC |
|-------|-----------------------|----------------------|
| 60 | 0 | 1 |
| 61 | 3 | 0 |
| 62 | 17 | 12 |
| 63 | 69 | 21 |
| 64 | 78 | 71 |
| 65 | 12 | 51 |
| 66 | 1 | 22 |
| 67 | 1 | 5 |
| 68 | 0 | 1 |
| 69 | 1 | 1 |
| Total | 182 | 185 |

On May 4, 1992, Superior communicated the results of the PCGS grading to Robert A. Levinson (Mr. Levinson), the estate's

attorney, and Mr. Levinson communicated these results to the coexecutors. The coexecutors believed that PCGS' grades were lower than expected and would lead to lower sale prices at the second auction because the rare coin market was in a "recession". On June 29, 1992, Mr. Levinson asked Mr. Goldberg to postpone the second auction. When Mr. Goldberg refused, the coexecutors, as cotrustees of the Trust, sued Superior to enjoin the second auction. Ms. Gonzalez represented to the court in seeking the injunction that the 191 coins were worth more than $12 million. On September 24, 1992, the Superior Court of the State of California for the County of Los Angeles (the superior court) issued an order enjoining the second auction. This was the beginning of protracted litigation between Superior and the estate. This litigation was settled 2 years later with the superior court rescinding the contract with Superior under which Superior was entitled to auction the 191 coins in return for a 7.5 percent seller's commission, and with Superior's returning the 191 coins to the estate.

The estate acquired numerous appraisals of the 191 coins immediately prior to and during the litigation with Superior. On July 2, 1992, Julian M. Leidman (Mr. Leidman) valued the 191 coins at $8.5 million, based on the assumption that the coins would be sold individually over an extended period of time in other than a declining market. The estate used this appraisal in

the litigation to enjoin the second auction.  Approximately 4 months later, Mr. Leidman appraised the 191 coins at $3.451 million.  The estate used this appraisal to value the coins at $3,192,175 on the estate tax return; the reported value equals the $3.451 million appraisal less an estimated 7.5 percent seller's commission of $258,825 which would be payable to Superior assuming that all 191 coins sold at the second auction.  Mr. Leidman also valued the 191 coins at $4.5 million as of the date of the decedent's death, and $3.78 million as of the alternate valuation date.

During the litigation between Superior and the estate, the estate recovered 36 additional coins which were owned by the decedent, and which Mr. Goldberg had not disclosed to the estate beforehand.  The decedent had consigned most of these coins to Superior to sell at auctions other than the two scheduled in 1992.  It was not until Mr. Goldberg was questioned about additional coins during the discovery process in the superior court proceeding that he admitted that some of the decedent's other coins were in his possession.  In or around March 1993, Superior informed the estate that the decedent had consigned numerous coins to Superior in 1991, and that 24 of these coins had not yet been sold.  One month later, Superior returned these 24 coins to the estate along with two other coins.  The remaining 10 coins (out of the 36 additional coins recovered by the estate)

consisted of the 8 coins which went unsold at the February 1992 auction and two other coins for which the record does not disclose the history.  The 36 additional coins were described on the estate tax return as "Additional group of gold coins" and 35 of these coins were valued on the return at $275,400.  No value was placed on the 36th coin.

In February 1992, the decedent instructed his personal accountant, Henry Schiffer (Mr. Schiffer), to prepare a list of the decedent's assets and each asset's estimated value.  The document was entitled "Ed Trompeter asset list (not including coins) as of February 21, 1992".  The document was based on conversations between Mr. Schiffer and the decedent, records maintained in Mr. Schiffer's office, and his contacts with people who maintained other records for the decedent.  Included on Mr. Schiffer's one-page list was, among other things, a gun collection valued at $10,000, a music collection valued at $50,000, and diamonds and other gems totaling $500,000.  None of these items were included on the decedent's estate tax return.

IV.  Pertinent Claims Against the Estate

The decedent and Ms. Trompeter separated on August 8, 1984, and 2 years later they were in the midst of a divorce proceeding. During the pendency of this proceeding, Barry Stuppler (Mr. Stuppler), president of a coin and appraisal store named Gold & Silver Emporium, prepared two disclosure statements identifying

the decedent's community property coins and each coin's appraised value.  The appraisal on the first statement totaled $5,200,673. The appraisal on the second statement totaled $1,684,444.

Shortly after the decedent's death, Ken Lodgen (Mr. Lodgen), the estate's accountant, informed the coexecutors that the decedent may not have disclosed his entire gold coin collection to Ms. Trompeter during the divorce proceeding, and that Ms. Trompeter may have a claim against the estate with respect thereto.  On June 16, 1992, Mr. Lodgen, using only Mr. Stuppler's first disclosure statement, supplied Mr. Levinson with a list allegedly identifying community property coins that were not disclosed to Ms. Trompeter during the divorce proceeding.  Many of the undisclosed coins set forth on Mr. Lodgen's list were included in Mr. Stuppler's second disclosure statement, which Mr. Lodgen did not know about when he compiled his list.

Based on the information provided by Mr. Lodgen, Ms. Trompeter claimed that she was not told about the existence of some of the decedent's gold coins acquired during their marriage, and that these coins were community assets.  On August 13, 1992, she filed a creditor's claim against the estate in probate court. This claim was denied.  On or about September 24, 1992, she sued the estate in the superior court, alleging, among other things, that the decedent had fraudulently concealed coins valued in excess of $10 million.  Ten months later, the parties to that

proceeding purportedly settled the case for $1,370,734; i.e., $1,486,000 less an offset of $115,266 in connection with the estate's payment of the shortage. Under the terms of the "settlement", the estate was required to pay Ms. Trompeter the amount stated therein by the earlier of (1) June 15, 1996, or (2) 90 days after the estate recovered possession of the 191 gold coins from Superior. On or around December 4, 1996, the superior court entered judgment against the estate for $1,370,734 plus interest from August 1, 1993, at a rate of 3.6 percent compounded semiannually through and including December 1, 1996. To date, the estate has not paid any of the judgment. The estate deducted $1,486,000 on the decedent's Federal estate tax return for Ms. Trompeter's claim.

A second claim against the estate was filed by Vivian Ballard Wong (Ms. Wong). She had a personal relationship with the decedent, and they had planned to marry. Ms. Wong filed a creditor's claim against the estate based on the decedent's alleged promise to transfer one-third of his estate to her. The claim was settled for $70,000.

A third claim against the estate was filed by Joe Pasko (Mr. Pasko), the son of a female former acquaintance of the decedent. Mr. Pasko filed a creditor's claim against the estate on January 14, 1993, alleging that the decedent had agreed to allow him to sell the decedent's diamonds, jade and ivory

collections, ancient Chinese artifacts, and handmade unique wool rug.  He alleged that these goods were worth at least $14 million, and that he was due a $1.4 million commission.  Mr. Pasko's claim was denied.  On June 15, 1993, Mr. Pasko filed suit against the estate in the superior court.  The suit was successfully opposed by the estate on demurrer.

V.  Preparation and Filing of Estate Tax Return

Right before the decedent died, he discussed his holdings with Ms. Gonzalez in depth, and he introduced her to his attorneys, accountants, financial advisers, bankers, and acquaintances in the coin world.  Following the decedent's death, the coexecutors fired the decedent's long-time counsel and retained Mr. Levinson to deal with estate tax matters.  The coexecutors also fired the decedent's long-time accountant, Mr. Schiffer, and retained the accounting firm of Frankel, Lodgen, Lacher, Golditch & Sardie (Frankel Lodgen) to serve as the estate's accountants.  Ms. Gonzalez instructed Mr. Schiffer to forward the decedent's records to Frankel Lodgen.

Patricia L. Bates (Ms. Bates) of Frankel Lodgen prepared the estate and 1991 gift tax returns based primarily on files received from Mr. Schiffer.  Ms. Bates arbitrarily chose in May 1993 to report the total value of the decedent's Sterling preferred stock at $15,335.  She and the coexecutors were both aware that prior valuations of his stock had been much greater

than $15,335, and that at least one recent appraisal had listed the value of his stock in excess of $3 million. Ms. Bates had also valued the decedent's stock 1 month earlier at $462,000, a value which included a 70-percent discount that she believed applied primarily to take into account the decedent's minority interest and the fact that the stock was not paying dividends. Ms. Bates brought her $462,000 valuation to the attention of Ms. Gonzalez in or about April 1993. Ms. Bates reported the value of the decedent's 191 coins at $3,192,175 based on Mr. Leidman's corresponding appraisal. Ms. Gonzalez did not inform Ms. Bates that Mr. Leidman had valued these coins at $8.5 million on another occasion. Ms. Bates asked Ms. Gonzalez whether the decedent owned any jewelry or diamonds at the time of his death. Ms. Gonzalez answered "no", and Ms. Bates did not report any jewelry or diamonds as assets of the decedent's estate.

On or before June 10, 1993, Frankel Lodgen presented Ms. Gonzalez with the decedent's estate tax return. She reviewed this return at length with Ms. Bates, and both Ms. Bates and Ms. Gonzalez signed the return on that day. Ms. Polachek signed the return 1 day later, and 5 days after that, the coexecutors filed the decedent's estate tax return with respondent. The coexecutors, on behalf of the estate, elected to value the estate on the alternate valuation date of September 18, 1992. The gross

estate was returned at $26,422,781. The taxable estate was returned at $12,002,201.

## VI. Reward Agreement

Various sources alerted respondent that the estate may have underpaid its estate tax. Among other things, several individuals supplied respondent with information regarding the decedent's holdings and estimated values. One of the primary catalysts for respondent's audit of the decedent's estate tax return was an informant's claim filed by Mr. Goldberg and his cousin Larry Goldberg (collectively the Goldbergs). Following numerous discussions, respondent and the Goldbergs entered into a reward agreement, under which the Goldbergs agreed to provide respondent with certain information on the decedent and his estate in exchange for a reward not to exceed $1 million. Under the agreement, the Goldbergs were required, if necessary, to testify before any court, grand jury, or any other forum investigating the decedent or his estate. Payment of the reward was contingent on respondent's conclusion that respondent received valuable information from the Goldbergs which was not previously known and which directly resulted in the collection of taxes, additions to tax, fines, and/or penalties from the estate. Under the reward agreement, the Goldbergs were not entitled to a reward if the evidence furnished was of no value.

## VII. Respondent's Jeopardy Assessment

On February 24, 1995, respondent, pursuant to a jeopardy assessment, seized assets located in two safe deposit boxes that were registered in the name of the Trust. The boxes were located respectively at First Interstate Bank and Union Bank in Encino, California. The safe deposit box at First Interstate Bank contained gold coins which belonged to the Trust and which, with one exception, were the 36 additional coins reported on the decedent's estate tax return. The safe deposit box at Union Bank contained assets that were not reported on the decedent's return. These unreported assets included gold and silver coins and a portion of the jewelry and gems in issue. The coexecutors reported on the decedent's estate tax return that he neither owned nor had access to a safe deposit box at the time of his death. In addition to the two safe deposit boxes at the banks, the decedent had a safe in his house. The coexecutors knew of the existence and location of the safe and safe deposit boxes, and they knew that the decedent had access to all three "safes".

OPINION[7]

Congress has imposed a graduated estate tax on wealth passing from one generation to another. The decedent was a man of considerable wealth, and his transfer of this wealth to the objects of his bounty was subject to this tax to a significant degree. To the extent that his wealth could be excluded from his taxable estate, his estate tax burden would be reduced and a greater portion of his wealth would pass on to the coexecutors, who were his daughters and only beneficiaries. From the point of view of the coexecutors, they would benefit directly by the removal of any value from the decedent's taxable estate.

Taxpayers may remove value from an estate, and otherwise minimize their taxes, by employing any legitimate means. In the case at hand, the question is whether the means employed by the

---

[7] During the trial, respondent elicited testimony from witnesses who included Kathleen Goldberg, Ira M. Goldberg, and Larry Goldberg. We find little of this testimony to be credible. Much of their testimony was vague, elusive, uncorroborated, inconsistent, and self-serving. Mr. Goldberg, in particular, is a person of questionable veracity. He did not reveal assets held by Superior which rightly belonged to the estate, he is a paid informant who is biased, and he was involved in litigation with the estate which fostered ill will between him and the estate's representatives. Under the circumstances, we are not required to, and we do not, rely on the testimony of these witnesses to support respondent's positions herein. See Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997); Henson v. Commissioner, 887 F.2d 1520, 1526 (11th Cir. 1989), affg. T.C. Memo. 1988-275; Ruark v. Commissioner, 449 F.2d 311, 312 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-48; Clark v. Commissioner, 266 F.2d 698, 708-709 (9th Cir. 1959), affg. in part and remanding in part T.C. Memo. 1957-129; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

estate were legitimate.  Respondent argues they were not. Respondent has generally determined that the estate, acting through its coexecutors:  (1) Attempted to conceal assets from the Government, (2) intentionally undervalued assets, and (3) intentionally overvalued deductions.  Respondent has adjusted the reported values of the subject assets and deductions, determined values for the unreported assets, and determined that the estate committed fraud.  The estate generally argues that it did nothing fraudulent.  According to the estate, it may have misvalued some of the reported assets and deductions, and failed to report some other assets, but it did not do so with the requisite fraudulent intent.  The estate also asserts that it did not misvalue the items to the extent determined by respondent.

We must disentangle the proffered values of decedent's wealth and determine whether the disputed items are adjustments to his reported taxable estate.  We also must pass on respondent's determination of fraud.  Fraud is a powerful assertion that we do not take lightly.  A bright line exists between fraudulent and negligent conduct, and an attempt to remove value from an estate does not necessarily constitute fraud.  One is not required to arrange his or her affairs so that the Government will receive more tax than it is rightfully owed. Nor is it fraudulent to construe an ambiguous law reasonably in a manner that is adverse to the Government.  Fraud occurs, however,

when a taxpayer deliberately overvalues property with an eye towards tax evasion, or attempts to conceal taxable assets from the reach of the Commissioner.

Property includable in a decedent's gross estate is included at its fair market value on either: (1) The date of the decedent's death or (2) the alternate valuation date described in section 2032. Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts". Sec. 20.2031-1(b), Estate Tax Regs.; see also secs. 2031(a), 2032(a);. Fair market value is a factual determination, and the trier of fact must weigh all relevant evidence of value and draw appropriate inferences. Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. National Grocery Co., 304 U.S. 282, 294 (1938). Respondent's determination of fair market value is presumed correct, and the taxpayer must prove it wrong. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).

An actual arm's-length sale of property is most indicative of its fair market value, assuming that the date of the sale is close to the valuation date. See Ward v. Commissioner, 87 T.C. 78, 101 (1986); Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982). If actual sales are not available, fair market value is determined based on a hypothetical willing buyer and a

hypothetical willing seller.  These hypothetical persons are not specific individuals or entities, and their hypothetical characteristics may differ from the personal characteristics of the actual seller or a particular buyer.  Estate of Watts v. Commissioner, 823 F.2d 483, 486 (11th Cir. 1987), affg. T.C. Memo. 1985-595; Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Kolom v. Commissioner, 644 F.2d 1282, 1288 (9th Cir. 1981), affg. 71 T.C. 235 (1978); Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990); Estate of Reynolds v. Commissioner, 55 T.C. 172, 195 (1970); see also Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996).

Experts often help the Court determine fair market value. We need not follow an expert's opinion, however, when it is contrary to our judgment.  If we believe it appropriate, we may adopt or reject an expert's opinion in its entirety, Helvering v. National Grocery Co., supra at 294-295, or adopt only selective portions of the opinion, Parker v. Commissioner, 86 T.C. 547, 562 (1986).  See Doherty v. Commissioner, 16 F.3d 338, 340 (9th Cir. 1994), affg. T.C. Memo. 1992-98.  With these basic principles in mind, we turn to the issues in dispute.

1.  Fair Market Value of the Decedent's Sterling Preferred Stock

Before addressing the value of the decedent's Sterling preferred stock, we pause briefly to decide a relevancy issue

raised by the estate as to facts concerning Sterling's redemption of the Sterling preferred stock. Respondent argues that the January 17, 1994, redemption of the Sterling preferred stock sets the stock's fair market value on the applicable valuation date. Respondent contends that the stock's fair market value totals $1,947,845, an amount that respondent derives from adding the redemption price of $1,533,482 to the $414,363 amount that was paid for "interest".

The estate argues that facts concerning the redemption are irrelevant to our determination. The estate claims that the redemption was not foreseeable on the applicable valuation date of September 18, 1992, given Sterling's questionable financial condition and its failure to meet redemptions which were scheduled, but not made, before that date. The estate points to the purchase agreement, under which Sterling could not redeem any of the Sterling preferred stock, or pay any dividends with respect thereto, if the redemption or payment would violate the terms of the senior debt or occur during any period of default on senior debt. The estate also observes that Sterling had forgone partial redemptions in 1991 and 1992.

We disagree with the estate that facts concerning the redemption are irrelevant to our determination of value. Although these facts may not necessarily set the fair market value of the Sterling preferred stock on the applicable valuation

date, see Estate of Scanlan v. Commissioner, T.C. Memo. 1996-331 (adjustments made to redemption price to account for passage of time, as well as the change in the setting from the date of the decedent's death to the date of the redemption), affd. without published opinion 116 F.3d 1476 (5th Cir. 1997), we believe they are relevant to our determination of that fair market value.  See Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987); Estate of Jephson v. Commissioner, 81 T.C. 999, 1002 (1983); see also Estate of Van Horne v. Commissioner, 720 F.2d 1114, 1116 (9th Cir. 1983), affg. 78 T.C. 728 (1982); Estate of Scanlan v. Commissioner, supra.  That the Sterling preferred stock would be redeemed on or before the December 31, 1995, date set forth in the purchase agreement, at or about the price stated therein, was foreseeable on September 18, 1992, based on the facts available on that date.  Doherty v. Commissioner, supra at 340.  The estate is mistaken in asserting that Sterling's financial position was too weak on September 18, 1992, to effectuate a redemption of the Sterling preferred stock on or after that date.  Sterling's 1990 through 1992 cash-flow was positive, and its losses for 1990 and 1991 stemmed mainly from its amortization of intangible assets and deferred financing costs.  Sterling's loss in 1991 was also attributable to the one-time writeoff of $2,953,646, an expense that sprang automatically from the death of a party subject to the underlying noncompetition agreement.  Sterling also realized

net income of $877,770 in 1992. Although Sterling's 1992 income statement did not report this income until after the applicable valuation date, it is reasonable to conclude under the facts herein that Sterling had (or could have obtained) enough information on September 18, 1992, to ascertain that it would report a significant amount of net income for that year.

The fact that Sterling had not effectuated partial redemptions in 1991 or 1992 is also not controlling. Redemptions during those periods were based on a "best efforts" standard, and Sterling's failure to redeem the Sterling preferred stock during those years under the circumstances herein does not support a finding that Sterling would have breached its obligation to effectuate the mandatory redemptions which were scheduled for each December 31, 1993 through 1995. Indeed, Sterling met its obligation to redeem the decedent's Sterling preferred stock when it redeemed all Sterling preferred stock on January 17, 1994. We will overrule the estate's relevancy objection to the admissibility of facts concerning the redemption.

Turning to the valuation issue, special rules govern the valuation of corporate stock. When stock is listed on an established securities market, the stock's value usually equals its listed market price. When stock is not listed on such a market, the stock's value may be based on arm's-length sales (if any) that have occurred within a reasonable time of the valuation

date.  Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982).  In the absence of arm's-length sales, the value of unlisted stock may be based on the value of listed stock of the subject corporation, or, if the corporation has no listed stock, the listed stock of like corporations engaged in the same or a similar line of business.  Sec. 2031(b); Estate of Hall v. Commissioner, 92 T.C. 312, 336 (1989).  Unlisted stock may also be valued indirectly by reference to the subject corporation's net worth, its prospective earning power, its dividend-earning capacity, its goodwill, its management, its position in the industry, the economic outlook for its industry, the degree of control represented by the block of its stock to be valued, and the amount and type of its nonoperating assets if not considered elsewhere.  See Estate of Hall v. Commissioner, supra at 335; Estate of Andrews v. Commissioner, supra at 940; sec. 20.2031-2(f), Estate Tax Regs.; see generally Rev. Rul. 59-60, 1959-1 C.B. 237.  In ascertaining the value of stock in a decedent's estate, all shares of that stock are aggregated.  See Ahmanson Found. v. United States, 674 F.2d 761 (9th Cir. 1981).

When ascertaining the value of unlisted stock by reference to listed stock, a discount from the listed price may be warranted in order to reflect the unlisted stock's lack of marketability.  Such a discount, commonly known as a "marketability discount", reflects the absence of a recognized

market for closely held stock and accounts for the fact that closely held stock is generally not readily transferable.  See Mandelbaum v. Commissioner, T.C. Memo. 1995-255.  A marketability discount also reflects the fact that a buyer may have to incur a subsequent expense to register the unlisted stock for public sale.  See Estate of Trenchard v. Commissioner, T.C. Memo. 1995-121.  The estate must prove the presence and amount of a marketability discount.  Rule 142(a); Estate of Gilford v. Commissioner, supra at 50-51.

Respondent did not call an expert at trial to support respondent's determination that the value of the decedent's Sterling preferred stock was $1,947,845.  Respondent relies mainly on Sterling's financial condition and Sterling's ability to redeem the decedent's shares in accordance with the purchase agreement.  The estate counters that the fair market value of the shares was $184,018.  The estate called an expert, Herbert T. Spiro (Mr. Spiro), to support this value, and the Court received his report into evidence.  See Rule 143(f).  Mr. Spiro, who is certified by the American Society of Appraisers, was a professor of finance at California State University, Northridge, California, from 1969 to 1988.  He currently manages a professional consulting organization which specializes in economic feasibility assessment and financial analysis.

Mr. Spiro valued the Sterling preferred stock by referencing the price-to-book values of comparable publicly traded preferred stock issues and arriving at a percentage to apply to the Sterling preferred stock. He concluded that the Sterling preferred stock was generally equivalent to a "C" and/or "D" rated security,[8] and that the Sterling preferred stock was closer to a "D" rating because it was nonpaying and much of Sterling's debt was "technically" in default. He noted that, near the applicable valuation date, Sterling had $2.8 million in accrued but undeclared dividends on all of its stock and $3.1 million of accrued but unpaid interest.

Mr. Spiro identified 10 comparable preferred stock issues. From those issues, he concluded that the following companies' issues at the high end of the "D" rating and the low end of the "C" rating were comparable to the Sterling preferred stock: TransWorld Airlines (TWA), Rymer Foods (Rymer), and SPI Holding (SPI). TWA's preferred stock had a "D" rating and was trading near the alternate valuation date at 11 percent of its call price. Rymer's preferred stock had a "C" rating and was trading near the alternate valuation date at 10.9 percent of its call price. SPI's preferred stock had a "C" rating and was trading near the alternate valuation date at 12.5 percent of its call

---

[8] A "C" rated security is a nonpaying issue. A "D" rated security is a nonpaying issue of an issuer that is in default on its debt.

price.  Mr. Spiro used the 11, 10.9, and 12.5 percentages from these comparable issues to derive a multiple to apply to the redemption price of Sterling's preferred stock to arrive at its freely traded value.  He settled on a 15-percent multiple for the Sterling preferred stock, concluding that an upward adjustment to the percentages derived from the comparable issues was necessary because Sterling had a positive cash-flow and was timely paying interest and principal on its senior debt.  He calculated that the freely traded value of each subject share was $150 (i.e., 15 percent of the $1,000 redemption price, exclusive of accrued dividends), and that the freely traded value of all of the decedent's Sterling preferred stock totaled $230,022.  Mr. Spiro reduced this freely traded value by 20 percent to reflect the stock's alleged lack of marketability, and opined that the fair market value of the decedent's Sterling preferred stock on the applicable valuation date was $184,018.

We are unpersuaded by Mr. Spiro's analysis and opinion.  The Sterling preferred stock was a better grade than a "C" or "D" rated security.  In addition to the fact that Sterling was paying its monthly operating expenses, Sterling was servicing its senior debt.  The fact that Sterling may have postponed paying interest and/or principal on some of its liabilities is not entitled to much weight, because any postponed payment was done with the consent of the relevant creditor.  Mr. Spiro also relied

inappropriately on companies that were not comparable to Sterling. TWA, for example, had filed for bankruptcy on January 31, 1992, and its auditor had expressed substantial doubt concerning its ability to continue as a going concern. Sterling, by contrast, was not in bankruptcy. Moreover, its 1990 through 1992 financial statements were accompanied by its auditor's unqualified opinion on the validity of those statements. The auditor did not conclude that Sterling was on the verge of bankruptcy or that its future corporate existence was in doubt. Likewise, Rymer's financial status resembled that of TWA. Rymer had been told that its line of credit would not be renewed, which raised serious concerns that, absent its recapitalization, it would be driven into bankruptcy. Nothing in the record persuades us that Sterling was on the verge of bankruptcy. To the contrary, the record indicates that Sterling was a viable entity that recapitalized primarily to alter its capital structure.

Finding no help from the only expert to testify on this issue, we are left to value the decedent's Sterling preferred stock based on the record at hand. We do not agree with respondent that the redemption price of the Sterling preferred stock equals its fair market value on September 18, 1992, a date that preceded the redemption by 16 months. Sterling's mandatory obligation to redeem the stock, however, does establish a benchmark for determining the applicable value. We concluded

above that it was foreseeable on September 18, 1992, that Sterling would redeem the Sterling preferred stock on or before December 31, 1995, at or about the price stated in the purchase agreement. We conclude similarly that a hypothetical willing buyer would have bought (and a hypothetical willing seller would have sold) the decedent's Sterling preferred stock on September 18, 1992, at a price that approximated the present value of the amounts that a holder of the decedent's Sterling preferred stock would have received for the mandatory redemptions. On each December 31 of 1993 through 1995, Sterling was obligated to redeem approximately 511.161 shares of Sterling preferred stock from the decedent (or a successor holder). Taking into account the fact that dividends accrued daily under the purchase agreement at the rates which were set forth therein, we find that Sterling was obligated to pay the following amounts for the redeemed shares on the respective dates: $871,023, $986,978, and $1,118,368.[9] Applying a reasonable discount rate of 4 percent to each amount to ascertain its present value on September 18, 1992, we find that these payments were worth $827,298, $900,676, and $980,562 on that date. We conclude that

---

[9] We find these amounts by using well-established present value formulae. For purposes of our computation, we assume that the Sterling preferred stock was issued on Mar. 15, 1989. Although the record discloses that Sterling issued the Sterling preferred stock in Mar. 1989, the record does not reference a specific date.

the applicable value of the decedent's Sterling preferred stock was approximately $2,708,536 ($827,298 + $900,676 + $980,562) on September 18, 1992.

We need not pinpoint exactly the fair market value of the decedent's Sterling preferred stock on the applicable valuation date. Suffice it to say that respondent determined that the applicable value of the decedent's Sterling preferred stock (including the accrued dividends) was $1,947,845, a value which is approximately 28 percent less than the approximate fair market value which we determine herein, and the estate has not persuaded us that the actual fair market value was less than respondent's determination. We sustain respondent's determination on this issue. See Anselmo v. Commissioner, 80 T.C. 872, 886 (1983), affd. 757 F.2d 1208 (11th Cir. 1985).

## 2. Two Hundred Twenty-Seven Gold Coins

### a. The 191 Coins

Respondent determined that the applicable value of the 191 coins was $8.5 million. Respondent called an expert, Steven Conturi (Mr. Conturi), to support this determination, and the Court received his report into evidence. See Rule 143(f). Mr. Conturi has been in the retail and/or wholesale rare coin business since 1975. He ascertained that the value of the 191 coins was $9,081,000, by referencing the price at which the coins last traded on the open market as listed in certain numismatics

newsletters.  Mr. Conturi acknowledged that overall sale prices in the coin market were lower toward the later part of 1992, but concluded that this "recession" had little if any effect on premium coin collections like the Trompeter Collection.  Mr. Conturi did not factor in any type of discount to arrive at his conclusion of fair market value.

The estate argues that the applicable value of the 191 coins was between $4.5 million and $4.8 million.  The estate relies on two experts.  The first expert, Maurice Rosen (Mr. Rosen), is the president of Numismatic Counseling, Inc., a rare coin company that specializes in assembling and managing investment portfolios.  He has been the editor of the Rosen Numismatic Advisory (a provider of coin analysis and market commentary) since 1976, and he was a part-time grader at NGC from 1987 through 1990.  He valued the 191 coins according to the following methodology.  First, he assigned an unadjusted value to each coin, based on raw price data and relevant grading factors.  In so doing, he graded 61 percent of the coins the same as PCGS, 26 percent of the coins lower than PCGS, and 13 percent of the coins higher than PCGS.  In the case of one set of coins (the 6-piece Amazonian Set), he did not grade the set but relied solely on his opinion as to its fair market value.  Second, he aggregated each coin's unadjusted value to arrive at an unadjusted value for all coins.  Third, he adjusted his

aggregated unadjusted value to reflect four discounts and one premium. The first discount, he testified, was a tainted status discount that takes into account the market's awareness that the second grading by NGC was on the high side and that the initial grading by PCGS was arguably the more reliable of the two gradings. The second discount, he testified, was a blockage discount that takes into account his belief that the market will react negatively to a sale of a large collection of coins at one time. The third discount, he testified, was a market factor discount that takes into account his belief that the rare coin market was in a poor state on the applicable valuation date and that dealers were reluctant to buy gold coins except at bargain basement prices. The fourth discount, he testified, was a contracts/low bids discount that takes into account his belief that Superior's contractual right to sell the coins at auction would have a depressing effect on their values. Mr. Rosen testified that the Superior contract and the sale of all coins at one time would potentially foster a prearranged bidding scheme whereby buyers would deliberately bid low.

Mr. Rosen established a range for each discount: 10 to 20 percent for the tainted status discount; 10 to 25 percent for the blockage discount; 10 to 15 percent for the market factor discount; and zero to 15 percent for the contracts/low bids discount. Acknowledging that his discounts overlapped somewhat,

he concluded that it was inappropriate to take the aggregated 75-percent maximum discount. He took the aggregated 30-percent minimum discount and reduced the aggregated unadjusted value of the coins by this percent. He then increased the resulting value by a small premium, which he concluded ranged from zero to 10 percent, to reflect the recognition of the decedent's name and its connection to the collection. Mr. Rosen then reduced the new amount by 7.5 percent to reflect Superior's auction fee. His unadjusted total valuation for the 191 coins was $6,202,850. After applying the aforementioned discounts, premium, and the 7.5-percent auction fee, Mr. Rosen concluded that the fair market value of the 191 coins on the applicable valuation date was $4,217,163.

The estate's second expert, Julian M. Leidman (Mr. Leidman), has dealt in rare coins full-time for over 30 years. He is a member of the American Numismatic Association and the Professional Numismatists Guild. He was retained by the estate to prepare five different appraisals of the subject coins. Four of these appraisals, all of which are mentioned above in our findings of fact, were for the 191 coins. For purposes of this proceeding, Mr. Leidman valued the 191 coins at $3.78 million. In so doing, he considered the decedent's contract to sell the coins through Superior, a declining coin market, the large number of pieces contained in the collection, the impact of flooding the

market, and the period of time in which the coins were to be sold.  He also assumed that the coins would be sold as a collection and not individually.  He contended that a 20-percent blockage discount was warranted, but did not ascertain such a discount separately because he inherently factored this discount into his analysis.

Although we find the experts helpful to our understanding of the world of numismatics, we find none of them helpful to our determination of the fair market value of the 191 coins.  Mr. Conturi ascertained the fair market value of the 191 coins based on the grades assigned by NGC, and he gave no consideration to PCGS' grades, which were the lower of the two gradings.  Mr. Rosen failed to consider market factors in reaching his conclusion of the coins' unadjusted value, and he took into account novel discounts which are not recognized for Federal tax purposes.  His tainted status discount, for example, rests on assumptions that we do not find to be valid on the facts herein.  This is also true for his market factor and contracts/low bid discounts.  With respect to the contract/low bid discount, in particular, auctions are an appropriate and often used means of presenting and selling rare coins.  We do not see how an auction sale would have a depressing effect on the sale prices of the decedent's coins.  As to the blockage discount, a blockage discount typically reflects the depressing effect of placing a

large block of stock on the open market for sale at one time. See sec. 20.2031-2(e), Estate Tax Regs.; see also <u>Estate of Sullivan v. Commissioner</u>, T.C. Memo. 1983-185. Even if we were to assume that such a discount applied to the rare coin market, which we do not find to be a valid assumption under the facts herein, the discount would be inapplicable here because the Trompeter Collection was an impressive collection with many unique coins. The market would have been able to handle all 191 coins, as evidenced by the fact that 96.2 percent of the decedent's 209 coins auctioned at the first auction sold there for an aggregate price that approximated the aggregate value calculated by the decedent.

Nor do we find Mr. Leidman helpful to our determination of the coins' fair market value. He valued the 191 coins at $3.78 million based on the assumption that the coins would be liquidated because they had to be sold. In making such an assumption, Mr. Leidman admittedly disregarded the mandate of section 20.2031-1(b), Estate Tax Regs., that "fair market value * * * is not to be determined by a forced sale price".[10] He also assumed inappropriately that the coins would be sold as a group and not individually.

---

[10] Mr. Leidman acknowledged on cross-examination that the 191 coins would be worth $8.5 million if the compulsion aspect was removed.

Finding none of the experts helpful to our determination of the coins' fair market value, we proceed to value the coins based on the record at hand.  We are guided by the decedent's valuation of the subject coins.  The decedent was a noted collector, with at least 20 years' experience in collecting and grading coins. The record shows that he did an excellent job in ascertaining the value of coins.  He ascertained that the 201 coins sold at the February 1992 auction were worth $2,598,000, and these coins sold for approximately $2,628,730.  The actual sales price differed by less than 2 percent from the decedent's valuation of these coins.

The decedent valued the 191 coins at $7,635,000.  Although the estate presented some evidence of a "buyer's market", we find that the economic downturn would not have materially affected the sale of the 191 coins because they were part of a premier collection.  We also do not believe under the facts herein that a reduction for an estimated seller's commission is warranted. Under section 20.2053-1(b)(3), Estate Tax Regs., an item may be deducted on an estate tax return though its exact amount is not then known, provided it is ascertainable with reasonable certainty and will be paid.  The superior court rescinded the contract with Superior under which Superior would receive a 7.5-percent seller's commission, and the 191 gold coins were returned to the estate.  We find no certainty that the estate will sell the coins in the future under a commission arrangement,

and, even if we did, we are unable to ascertain the amount of any future seller's commission with reasonable certainty.  We hold that the applicable value of the 191 coins is $7,635,000.

b.  Thirty-Six Additional Coins

Respondent determined that the applicable value of the 36 additional coins was $816,300.  Respondent's expert, Mr. Conturi, valued these coins using the same methodology that he employed to value the 191 coins.  Mr. Conturi concluded that the fair market value of the 36 coins was $609,770 on the alternate valuation date.  Respondent concedes that the value of these 36 coins is no higher than Mr. Conturi's valuation.

The estate asserts that the fair market value of the 36 coins was $274,650.  Mr. Leidman valued 35 of these coins, and his analysis generally parallels his analysis for the 191 coins. He testified that 35 of the 36 coins had a fair market value of $274,650 on the alternate valuation date; neither he nor the estate addressed the value of the 36th coin at trial.

We have the same inherent problems with the experts' valuations of the 36 additional coins, as we did with their valuations of the 191 coins.  We reject both of their opinions. We are uncomfortable, however, with the value ascribed to these coins by respondent.  Accordingly, we proceed to value the coins based on the record at hand.  Although the decedent did not value the 36 additional coins, he did value the 191 coins mentioned

above, and the 36 coins were sufficiently similar to the 191 coins to allow us to rely on the decedent's valuation of the 191 coins for purposes of valuing the 36 additional coins. The decedent valued the 191 coins at $7,635,000, a figure that is 18.9 percent lower than the $9,081,000 value ascertained by Mr. Conturi. Based on our analysis of the 191 coins, we find that Mr. Conturi overvalued the 36 coins by 18.9 percent. We conclude that the fair market value of the 36 additional coins on the applicable valuation date was $494,523 (i.e., $609,770 less 18.9 percent).

3.  Fair Market Value of Unreported Items

Respondent determined that the estate failed to report $14 million in diamonds, jewelry, gems, art, and artifacts. Respondent's determination is based primarily on Joe Pasko's (Mr. Pasko) claim for the $1.4 million commission, wherein he stated that the decedent retained him to sell assets that were worth at least $14 million. Respondent's determination is also based on the value of the assets that were seized from the safe deposit boxes.

The estate has conceded that the estate failed to report approximately $1 million of this $14 million amount. The estate argues that certain of the seized assets were property that the decedent had given in September 1991 to the coexecutors, in their individual capacities. The estate points to the testimony of the

coexecutors to the effect that the decedent had given them most of the seized assets, and that they had placed the assets in one of the safe deposit boxes for safekeeping.

We are unpersuaded by the coexecutors' testimony that the decedent gave them some of the seized assets, and the record shows to the contrary; e.g., several witnesses testified that they had seen some of the seized assets in the decedent's possession after the alleged gifts took place. We look to the objective facts in the record, and we find that a Federal gift tax return was never filed reporting these items as gifts. We also find that these items were seized from a safe deposit box that was in the name of the Trust. We conclude that the seized assets were owned by the decedent (through the Trust) when he died, and that they were includable in his gross estate.

We are unable to conclude, however, that the estate failed to report $14 million in assets, as determined by respondent. The record does not disclose all of the unreported assets that respondent believes makes up the disputed amount of approximately $13 million, and we conclude from the record that Mr. Pasko was not knowledgeable on the full extent of the decedent's holdings. Following our detailed review of the record, we find that the estate failed to report $4.5 million of assets (inclusive of the approximately $1 million amount conceded by the estate). In addition to the items which were seized from the safe deposit

boxes, the unreported assets consist mainly of gems, jewelry, furniture, and a music collection.

## 4. Other Items

### a. The $115,266 Shortfall

Respondent increased the decedent's adjusted taxable gifts by $115,266 to reflect a post-death gift made to Ms. Trompeter in connection with the $3,077,100 payment to CFTB. Ms. Trompeter was obligated to indemnify Sterling for half of the amount paid to CFTB, but, because her subaccount had only $1,423,772 in cash when the payment was due, the coexecutors authorized the escrow agent to pay the $115,266 shortage from the decedent's subaccount. Respondent determined that the estate's payment of the shortage, coupled with the later "offset" of the $115,266 in connection with the "settlement" of Ms. Trompeter's claim, was an adjusted taxable gift made by the coexecutors on behalf of the estate.

We disagree with respondent's determination. Although respondent is correct that Ms. Trompeter became liable to the estate for $115,266 when its assets were used to pay a portion of her obligation, and that she never repaid this amount to the estate, these facts standing alone do not mean that the estate made a $115,266 gift to her. The value of the loaned funds was included in the decedent's gross estate. Thus, no further

addition to the decedent's estate is warranted on account of this transaction.  We hold for the estate on this issue.

b.  The Decedent's 1990 Bad Debt Deduction

Respondent increased the decedent's adjusted taxable gifts by $327,447 to reflect respondent's disallowance of various bad debt deductions claimed by the decedent on his 1990 Federal income tax return.  The decedent claimed a $327,447 short-term capital loss, described as "loans to third parties", with respect to the following transactions:  (1) On February 17, 1990, he gave Ms. Wong $30,000; the underlying "note" conditions repayment of the "loan" on Ms. Wong's sale of her residence; (2) on May 21, 1990, he gave Ms. Wong $38,000; the record contains neither a note nor any other reliable evidence of a loan; (3) on May 26, 1990, he gave $209,447 to Ms. Wong's mortgagee; the record contains neither a note nor any other reliable evidence of a loan; (4) on October 17, 1990, he gave Phil Skauronski (Mr. Skauronski) $25,000, and Mr. Skauronski gave the decedent a "note" stating that he would repay the $25,000 with 15.5 percent interest in 12 equal monthly payments; and (5) on October 22, 1990, the decedent gave Mr. Pasko $25,000; Mr. Pasko and the decedent both signed a "note" that did not provide for interest, security, collateral, or a fixed schedule of repayment.  Mr. Pasko has never made any payments on this "loan".

Respondent argues that these transactions were not bona fide loans, but unreported taxable gifts. The estate does not address the "loans" to Mr. Skauronski and Mr. Pasko. The estate contends that the payments to Ms. Wong were loans, or, in the alternative, consideration for services rendered.

We agree with respondent. An individual may claim a short-term capital loss for a nonbusiness bad debt that becomes worthless during the taxable year. Sec. 166(d). In order to do so, however, the debt must be bona fide. A bona fide debt arises "from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money". Sec. 1.166-1(c), Income Tax Regs. A bona fide debt does not include an advance to a friend solely for reasons other than to make a profit.

Case law establishes a two-part test for determining whether a transfer of money qualifies as debt. First, repayment of the purported debt cannot be contingent upon a future event. Second, the transfer must be made with a reasonable expectation, belief, and intention that it will be repaid. See Zimmerman v. United States, 318 F.2d 611 (9th Cir. 1963). Whether a transfer is made with the requisite expectation, belief, and intent is factual, John Kelley Co. v. Commissioner, 326 U.S. 521 (1946), and the following nonexclusive factors, none of which is controlling by itself, are relevant to this determination: (1) Whether a note

or other evidence of indebtedness exists; (2) whether interest is charged; (3) whether there is a fixed schedule for repayments; (4) whether any security or collateral is requested; (5) whether there is any written loan agreement; (6) whether a demand for repayment has been made; (7) whether the parties' records, if any, reflect the transaction as a loan; (8) whether any repayments have been made; and (9) whether the borrower was solvent at the time of the loan, see Zimmerman v. United States, supra at 613; Estate of Maxwell v. Commissioner, 98 T.C. 594, 604 (1992), affd. 3 F.3d 591 (2d Cir. 1993); Clark v. Commissioner, 18 T.C. 780 (1952), affd. 205 F.2d 353 (2d Cir. 1953). These factors focus primarily on ascertaining the intent of the parties to the transfer through their objective and subjective expectations. Bauer v. Commissioner, 748 F.2d 1365, 1367-1368 (9th Cir. 1984), revg. T.C. Memo. 1983-120; A.R. Lantz Co. v. Commissioner, 424 F.2d 1330, 1333-1334 (9th Cir. 1970).

Applying this two part analysis to the subject transactions, we find that the $30,000 transfer to Ms. Wong fails the first part of this analysis. Because the underlying note conditions repayment of the "loan" on the sale of her house, she was under no absolute obligation to repay the "loan". She would never have to repay the "loan", for example, if she never sold her home. This transaction is not bona fide debt for purposes of section 166.

As to the other transactions, none of these transactions evidence a repayment contingency. Thus, we conclude that they meet the first part of our analysis and turn to the second part. We divide the remaining transactions as follows: (1) Remaining transactions with or concerning Ms. Wong, (2) transaction with Mr. Skauronski, and (3) transaction with Mr. Pasko.

Ms. Wong's remaining transactions do not meet the second part of our analysis. We find no note or evidence of indebtedness for the transactions. We do not find that she was required to pay interest on the "loaned" amounts. We do not find a fixed schedule of repayment, security, or collateral. We do not find that the decedent or his estate demanded that she repay any part of the "loaned" amounts, or that she actually repaid any amount. We do not find that either she or the decedent considered either transaction a loan. We conclude that Ms. Wong's remaining transactions were not bona fide loans.[11]

As for the $25,000 transfer to Mr. Skauronski, we find similarly. Although the estate presented evidence of a note issued to the decedent for the transaction, we do not find this "note" dispositive. We know nothing about Mr. Skauronski, but his name. Although the estate contends that the estate made a demand for repayment of the "loaned proceeds", the record does

---

[11] Nor do we find that the subject amounts were paid to Vivian Ballard Wong as compensation for services rendered.

not support this contention.  We conclude that this transaction
was not a bona fide loan.

Nor do we find that the transaction between the decedent and
Mr. Pasko was a bona fide loan.  Although the transaction is
evidenced by a "note" signed by both Mr. Pasko and the decedent,
the note provides no schedule of repayment, no interest, no
security, and no collateral.  Nor were payments actually made on
this "note".  We conclude that this transaction was not a bona
fide loan.

Because we find that none of the bad debts claimed by the
decedent were bona fide loans, we proceed to address whether the
amounts of the purportedly worthless debts are included in the
decedent's estate tax computation as adjusted taxable gifts.  An
estate's tax liability equals (1) the tentative tax on the sum of
the taxable estate plus the adjusted taxable gifts, less (2) the
aggregate tax on all gifts made after December 31, 1976.  Sec.
2001(b).  Adjusted taxable gifts are computed by subtracting
certain deductions (none of which are applicable herein) and
exclusions from the taxable gifts that were made during the
taxable period.  Sec. 2001(b); Estate of Smith v. Commissioner,
94 T.C. 872, 874 (1990).  A taxable gift is any transaction
whereby property is passed gratuitously to another.  Sec.
25.2511-1(c), Estate Tax Regs.  The decedent is allowed to

exclude annually $10,000 of the total gifts which he made to each person.  See sec. 2503(b).

We hold that the decedent's transfers to or on behalf of Ms. Wong, Mr. Skauronski, and Mr. Pasko are includable in the decedent's estate tax computation as taxable gifts.  After applying the annual exclusion for each donee, the decedent's adjusted taxable gifts for 1990 are increased by $267,447, $15,000, and $15,000, respectively, or a total of $297,447.

c.  The $258,825 Claim Against Superior

Respondent determined that the estate had a $258,825 claim against Superior, and that this claim was miscellaneous property of the estate.  The estate valued this claim at zero on the estate tax return, identifying it as a claim against Superior for the release of coins assigned to Superior.  The return noted that the probability and amount of any collection of this claim was unknown.

We hold for the estate on this issue.  The value of this claim was zero on the applicable valuation date, as evidenced by the fact that the estate received only its coins back in settlement of its dispute with Superior.  The value of the returned coins was included in the gross estate, as discussed above.

5.  Ms. Trompeter's Claim

Respondent disallowed the estate's $1,486,000 deduction for the claim of Ms. Trompeter. Respondent argues primarily that a genuine controversy did not exist between Ms. Trompeter and the estate, and that the estate claimed the deduction solely to reduce its estate tax liability. Respondent contends that the estate challenged the claim in probate court to create the appearance of a valid claim, and that Ms. Trompeter's complaint in superior court was a sham. Respondent contends that the superior court's consent decree approving the purported settlement was not on the merits of her claim. Alternatively, respondent argues, even if the estate and Ms. Trompeter were involved in a real controversy, the estate has not proven that Ms. Trompeter's claim was allowable under applicable State law. Respondent contends that the record does not show that coins were withheld from her during the divorce proceeding, which is the linchpin of her claim. The estate concedes that its original computation of the deduction for Ms. Trompeter's claim was wrong, and that subsequent recomputations are less than the reported amount. The estate asserts that it is entitled to a deduction of $682,025.

We agree with respondent's result on this issue. For purposes of computing a taxable estate for Federal estate tax purposes, an estate may deduct certain claims against it that are allowable "by the laws of the jurisdiction * * * under which the

estate is being administered". Sec. 2053(a). Claims are deductible if they are based on the personal obligation of the decedent at the time of his or her death. Sec. 20.2053-4, Estate Tax Regs. A liability arising out of tort is an example of a claim that is deductible under section 2053(a).

The issue here is whether Ms. Trompeter had a valid claim against the estate under California law. We begin our inquiry by looking at the proceeding in the superior court, which culminated in that court's entering a consent decree in favor of Ms. Trompeter. Section 20.2053-1(b)(2), Estate Tax Regs., provides that a consent decree before a local court will be accepted as a basis for an estate tax deduction. Section 20.2053-1(b)(2), Estate Tax Regs. further provides that:

> The decision of a local court as to the amount and allowability under local law of a claim or administration expense will ordinarily be accepted if the court passes upon the facts upon which deductibility depends * * * However * * * It must appear that the Court actually passed upon the merits of the claim. This will be presumed in all cases of an active and genuine contest. * * *

As noted by the Court of Appeals for the Ninth Circuit, "an order of a state Court that adversely affects the tax right of the United States and which is based upon a nonadversary proceeding, does not foreclose the federal courts from [independently] determining the tax liabilities". Wolfsen v. Smyth, 223 F.2d 111, 113-114 (9th Cir. 1955) (quoting Newman v. Commissioner, 222 F.2d 131, 136 (9th Cir. 1955), affg. 19 T.C. 708 (1953)); see

also Robinson v. Commissioner, 102 T.C. 116 (1994), affd. on this issue 70 F.3d 34 (5th Cir. 1995).

As an initial matter, we find that the State court proceeding did not involve a real and bona fide controversy between adverse parties, and that the superior court's decree was not the result of its consideration of the merits of Ms. Trompeter's claim. See Estate of Nilson v. Commissioner, T.C. Memo. 1972-141. Ms. Trompeter was the coexecutors' mother, and the coexecutors' actions during the State court proceeding were more akin to daughters' trying to share inherited wealth with their parent at the expense of the tax collector, than a party suing another in a truly adversarial proceeding in a court of law. As a point of fact, the coexecutors did not investigate or legitimately challenge the validity of Ms. Trompeter's claim before they let their mother receive a significant part of the decedent's estate.

Nor did Ms. Trompeter pursue payment on the "settlement" in a meaningful manner. She only pursued collection of the "settlement" when the superior court informed the parties there that they had neglected to file a dismissal in the case. Before this time, neither party had acted on the settlement or moved toward final judgment in 3 years. The estate had recovered the 191 coins from Superior in 1994, and the estate's recovery of the coins was the prerequisite to payment under the "settlement"

agreement.  Surely, a reasonable party in an adversarial proceeding would have pursued collection of the "settlement" once the estate recovered the coins.  We hold that the State court action was nonadversarial.

We also are unpersuaded that the State court actually passed upon the merits of Ms. Trompeter's claim, or that the claim would have been allowed if examined on its merits.  Mr. Lodgen's conjecture that coins in which Ms. Trompeter had a community interest were not disclosed to her during the divorce proceeding was specious.  He relied inappropriately on unsubstantiated information acquired from Superior and Mr. Goldberg.  Mr. Lodgen failed to take into account a second set of coins disclosed in the divorce settlement negotiations.  Mr. Lodgen failed to recognize the relevant time period for compiling the decedent's coin holdings.[12]  We sustain respondent's determination on this issue.

---

[12] Ken Lodgen included all coins purchased before June 22, 1987, as coins that possibly were undisclosed by the decedent. Under Cal. Civ. Code sec. 5118 (1983), which was in effect at the time, "The earnings and accumulations of a spouse * * * while living separate and apart from the other spouse, are the separate property of the spouse".  When we exclude the coins that were acquired after the decedent and Sylvia Trompeter separated on Aug. 8, 1984, and the coins without a proven purchase date, we are unpersuaded that any of the decedent's coins in which Ms. Trompeter had a community property interest were excluded from Barry Stuppler's combined appraisal statements.

6.  Fraud Penalty

Respondent determined that the estate is liable for the fraud penalty under section 6663(a).  Respondent determined that the fraud penalty applies to the underpayment of tax attributable to the omission of assets, the undervaluation of assets, and the deduction for Ms. Trompeter's claim.

Section 6663(a) imposes a 75-percent penalty on an underpayment that is attributable to fraud.  See also sec. 6664(a) (definition of "underpayment").  When respondent proves that some part of an underpayment is attributable to fraud, the entire underpayment is attributable to fraud unless the taxpayer proves otherwise.  Sec. 6663(b).  Section 6663(a) does not reach any portion of an underpayment for which there is reasonable cause or for which the taxpayer acted in good faith.  Sec. 6664(c).

Respondent must prove fraud by clear and convincing evidence.  Sec. 7454; Rule 142(b); see also Castillo v. Commissioner, 84 T.C. 405, 408 (1985).  Respondent must prove that the estate underpaid its taxes, Lee v. United States, 466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274; Parks v. Commissioner, 94 T.C. 654, 660-664 (1990), and that the estate did so with the requisite fraudulent intent.  Fraud requires an intentional wrongdoing on the part of the taxpayer

with the specific purpose of evading a tax believed to be owing. Conforte v. Commissioner, 692 F.2d 587, 592 (9th Cir. 1982), affg. in part, revg. in part on other grounds 74 T.C. 1160 (1980); Miller v. Commissioner, 94 T.C. 316, 332 (1990); Petzoldt v. Commissioner, 92 T.C. 661, 698 (1989).  A fraudulent intent is present if the estate filed a return intending to conceal, mislead, or otherwise prevent the collection of tax.  See Spies v. United States, 317 U.S. 492, 499 (1943); Akland v. Commissioner, 767 F.2d 618, 621 (9th Cir. 1985), affg. T.C. Memo. 1983-249; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

With respect to the first prong, the estate concedes that it failed to report certain assets and undervalued other assets. The estate also concedes that the nonreporting of these assets generated an underpayment of Federal estate tax.  We hold that respondent has met the first prong in that the record shows clearly and convincingly that the estate underpaid its tax liability.[13]

Turning to the second prong, a fraudulent intent may be proven by circumstantial evidence because direct proof of a taxpayer's intent is rarely available.  Reasonable inferences may be drawn from the relevant facts.  Spies v. United States, supra at 499; Akland v. Commissioner, supra at 621; Stephenson v.

---

[13] Our disallowance of Ms. Trompeter's claim also generates an underpayment.

Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). The fraudulent intent of an executor is treated as that of the estate. See Estate of Pittard v. Commissioner, 69 T.C. 391 (1977); see also Estate of Fox v. Commissioner, T.C. Memo. 1995-30, affd. without published opinion 100 F.3d 945 (2d Cir. 1996); Estate of Edens v. Commissioner, T.C. Memo. 1981-557, affd. without published opinion 696 F.2d 989 (4th Cir. 1982).

Courts have relied on certain indicia of fraud in deciding whether a taxpayer had the requisite fraudulent intent. Indicia of fraud include: (1) Understating income, (2) maintaining inadequate records, (3) failing to file tax returns, (4) giving implausible or inconsistent explanations of behavior, (5) concealing assets, (6) failing to cooperate with tax authorities, (7) engaging in illegal activities, (8) attempting to conceal illegal activities, and (9) dealing in cash. Recklitis v. Commissioner, 91 T.C. 874, 910 (1988); see also Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Lee v. Commissioner, T.C. Memo. 1995-597. These "badges of fraud" are nonexclusive. Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992). The taxpayer's education and business background are also relevant to the determination of fraud. Id. Bearing these general principles in mind, we turn to the indicia of fraud that are relevant to the instant case.

a.  Undervaluation of Assets

Respondent argues that the estate intentionally undervalued the decedent's gold coins and Sterling preferred stock, and that this undervaluation evidences fraud.  We agree.  When we view the record as a whole, we conclude, clearly and convincingly, that the estate intentionally undervalued the decedent's taxable estate, and that the estate did so with the specific intent of evading tax.

Numerous facts evidence that the estate filed the decedent's Federal estate tax return intending to evade Federal estate tax by undervaluing assets and overvaluing deductions.  First, the estate's undervaluation of decedent's Sterling preferred stock was significant.  The estate reported that the applicable value was $15,335, and we have determined that the applicable value was approximately $2,708,536.  The difference between these two values is $2,693,201, or, in other words, the reported value was less than 1 percent of our determined value.  Although the estate attempts to place the blame for the undervalued Sterling preferred stock on Ms. Bates, the fact of the matter is that Ms. Gonzalez obviously knew that Ms. Bates' valuation of $15,335 was wrong and reported Ms. Bates' $15,335 value aiming solely to evade tax.  Ms. Gonzalez knew of a prior valuation of the Sterling preferred stock in excess of $3 million, and she knew that Ms. Bates arbitrarily chose the $15,335 figure reported on

the estate tax return as the stock's value. Ms. Gonzalez also knew that Ms. Bates had valued the stock at $462,000 1 month before she valued it at $15,335. Given Ms. Gonzalez's education and business acumen, as well as her knowledge that the preferred stock was entitled to certain preferences, that the preferred stock was accruing dividends daily at a substantial rate, that the preferred stock was soon going to be subject to a mandatory redemption, and that a redemption of the preferred stock would result in the holder(s) thereof receiving millions of dollars in proceeds, we are hard pressed to conclude, as requested by the estate, that Ms. Gonzalez was ignorant of the approximate value of the decedent's Sterling preferred stock, or that she thought that the stock was worth only $15,335. We conclude the contrary.

Second, the estate undervalued decedent's gold coins by a significant amount. The estate reported that the applicable value of the 191 coins was $3,192,175, and that the applicable value of the additional coins was $275,400. We have determined that the applicable values were $7,635,000 and $494,523, respectively. The total value that we have determined for the coins is $4,661,948 more than the total value reported by the estate, or, in other words, the reported total value was approximately 42.7 percent of the determined total value. Ms. Gonzalez knew that the 191 coins had been appraised at a significantly higher amount than the value reported on the

return, and she secreted Mr. Leidman's $8.5 million appraisal from Ms. Bates.  Given the additional fact that Ms. Gonzalez and the decedent had discussed his coin holdings at a time close to his death, and that she had represented to the court in the Superior litigation that the 191 coins were worth more than $12 million, we find that Ms. Gonzalez was well aware that the $3,467,575 total value reported on the return was wrong.

Third, the estate failed to report any value for the assets in the safe deposit box at Union Bank, and, in an attempt to conceal the existence of this box, the coexecutors stated on the estate tax return that decedent did not own or have access to a safe deposit box at the time of his death.  In a further attempt to conceal the existence of the safe deposit box at Union Bank, the coexecutors failed to report the existence of the safe deposit box at First Interstate Bank, choosing only to report a value for 35 of the coins which were found therein.[14]  In yet another attempt to conceal the contents of the safe deposit box at Union Bank, Ms. Gonzalez falsely answered in the negative when Ms. Bates asked her whether the decedent owned any jewelry or diamonds when he died.  The decedent did own jewelry and diamonds

---

[14] The estate would have reported the existence of the safe deposit box at First Interstate Bank by stating on the decedent's estate tax return that he had access to a safe deposit box when he died.  Such a statement would most likely have led respondent to investigate further the circumstances of the box, which could have led respondent to discover the safe deposit box at Union Bank.

at that time, and these assets were kept in the safe deposit box at Union Bank.

Fourth, the estate chose to report no value for the $4.5 million of assets which we have determined were includable in the decedent's gross estate. The coexecutors knew about these assets, as evidenced by the fact that the decedent informed Ms. Gonzalez of his holdings at about the time of his death. The decedent also introduced Ms. Gonzalez to the persons who would know most about his holdings, and he had Mr. Schiffer schedule a list of the decedent's assets as of February 21, 1992. Mr. Schiffer's list included the decedent's gun collection, music collection, and various diamonds and other gems, none of which were included in the decedent's gross estate.

Fifth, the coexecutors fabricated (and deducted on the estate tax return) a $1,486,000 "claim" by Ms. Trompeter. As mentioned above, we find that the coexecutors devised this claim attempting to transfer some of the decedent's property to their mother at the expense of the tax collector. In fact, the estate has conceded in this proceeding that it overstated its deduction for the "claim" by $803,975.

We conclude that this factor evidences fraud.

b. Implausible and Inconsistent Explanations of Behavior

Respondent argues that Ms. Gonzalez offered numerous implausible and inconsistent explanations of her behavior, and

that these "explanations" evidence fraud. We agree. We find much of Ms. Gonzalez' testimony incredible and inconsistent with reliable evidence in the record. For example, Ms. Gonzalez testified that the decedent gave her some of the disputed jewelry, and that she placed this jewelry in the safe deposit box unbeknownst to him. This testimony was pointedly rebutted by the credible testimony of independent witnesses to the effect that the decedent possessed this jewelry after the time when the gift was allegedly made. Ms. Gonzalez also equivocated on when the decedent purportedly gave her the assets seized from the safe deposit box. In one breath, Ms. Gonzalez stated that she received the assets at one time, while, in another breath, she stated that she received the assets at a different time.

Ms. Gonzalez also testified that she intentionally kept documents from Ms. Bates, the estate's tax preparer, testifying with respect to Mr. Leidman's $8.5 million appraisal, that she did not think the appraisal was relevant to the estate's valuation of the 191 coins. The appraisal was relevant to Ms. Bates' reporting of that value, and Ms. Gonzalez' secretion of that and other documents from Ms. Bates is an example of implausible behavior under the facts herein. Ms. Gonzalez also testified incredibly that she did not know that she had signed the decedent's estate tax return under the penalties of perjury. Ms. Gonzalez is college educated, and she has prior work

experience. She also is knowledgeable on, and has experience with, her personal income tax returns which are filed under penalties of perjury.

We conclude that this factor evidences fraud.

### c. Omission or Concealment of Assets

Respondent argues that the estate omitted and concealed assets, and that these actions evidence fraud. Respondent points to the fact that the estate failed to report a large amount of assets. The estate concedes that certain items were wrongly omitted from the decedent's estate tax return, but argues that the estate did not fail to report these items intending to conceal them. The estate contends that the items seized from the safe deposit boxes were given to the coexecutors in September 1991, and that the coexecutors believed that the assets were not includable in the estate.

We agree with respondent that the presence of unreported assets in this case is evidence of fraud. The decedent had advised Ms. Gonzalez of his holdings at a point in time that was close to his death, and he had introduced her to all of his advisers. The coexecutors simply did not include all of the decedent's assets in his gross estate. Even if we were to assume arguendo (and contrary to the record) that the decedent gave some items to the coexecutors in September 1991, this does not explain why several other items were omitted from the decedent's estate

tax return.  This also does not explain the fact that the estate attempted to conceal the safe deposit boxes from the Government by reporting on the decedent's estate tax return that he neither owned nor had access to a safe deposit box when he died.  The coexecutors knew that the decedent owned the safe deposit boxes at the banks, or at least that he had access to them.  The coexecutors also knew that the decedent owned and had access to the safe in his house.

We conclude that this factor evidences fraud.

d.  Failure To Cooperate

Respondent argues that fraud is seen from Ms. Gonzalez' failure to include any diamonds in the estate, and her failure to disclose all of the decedent's records revealing purchases of jewelry, gems, art, and other artifacts when originally requested.

We agree.  Ms. Gonzalez failed initially to provide respondent with all of the decedent's canceled checks which evidenced the purchase of jewelry, gems, art, and other artifacts.  Ms. Bates also asked Ms. Gonzalez whether the decedent owned any jewelry or diamonds when he died, and Ms. Gonzalez answered in the negative.

We conclude that this factor evidences fraud.

e.  Other Considerations

Each coexecutor is college educated, and both have extensive work experience.  Each knows about her obligation to file valid Federal tax returns.

f.  Conclusion

After our detailed review of the facts and circumstances of this case, in conjunction with our analysis of the factors mentioned above, we conclude that respondent has clearly and convincingly proven that the coexecutors filed the decedent's estate tax return intending to conceal, mislead, or otherwise prevent the collection of tax.  We also conclude that section 6664(c) does not insulate the estate from this penalty; we find no reasonable cause for the underpayment, nor that the estate acted in good faith with respect to the underpayment.  We sustain respondent's determination of fraud.

We have considered all arguments made by the parties, and, to the extent not addressed above, find them to be irrelevant or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.