279 F.3d 767
 ESTATE OF Emanuel TROMPETER, Deceased; Robin Carol Gonzalez Trompeter and Janet Ilene Trompeter Polachek, Co-Executors, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 99-70805.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted September 20, 2001.*
 Filed January 30, 2002.
 
 Avram Salkin (argued), Hochman, Salkin, Rettig, Toscher & Perez, P.C., Beverly Hills, CA; Robert A. Levinson, Levinson & Kaplan, Encino, CA, for petitioners-appellants.
 Randolph L. Hutter, Department of Justice, Tax Division, Washington, DC, for respondent-appellee.
 Appeal from a Decision of the United States Tax Court; David Laro, Tax Court Judge, Presiding. Tax Ct. No. 11170-95.
 Before FERNANDEZ, KLEINFELD, and McKEOWN, Circuit Judges.
 McKEOWN, Circuit Judge.
 
 
 1
 This case requires us to consider whether the Tax Court detailed its reasoning with the requisite specificity dictated by Leonard Pipeline Contractors v. Comm'r, 142 F.3d 1133, 1135-36 (9th Cir.1998). The Estate of Emanuel Trompeter and Trompeter's daughters, who are co-executors of the estate (collectively, the "Estate"), appeal from a Tax Court decision partially upholding a multi-million dollar deficiency determination by the Internal Revenue Service and imposing a 75 percent penalty for fraud. Because the Tax Court did not articulate sufficiently the basis for its ruling on omitted assets and its rationale with respect to the valuation of certain stock, we vacate the Tax Court's decision and remand for further proceedings.
 
 BACKGROUND
 
 2
 Emanuel Trompeter, a wealthy entrepreneur who resided in Southern California, died on March 18, 1992, at the age of 73. His only surviving children, Robin Carol Trompeter Gonzalez and Janet Ilene Trompeter Polachek, are the Estate's co-executors and its only beneficiaries.
 
 
 3
 Trompeter earned much of his wealth during his tenure as proprietor of Trompeter Electronics, Inc. ("TEI"), a privately-held entity that he and his former wife, Sylvia Trompeter, founded in 1960. TEI specialized in, among other things, manufacturing components of air-to-ground missiles. In 1989, Sterling Holding Co. ("Sterling"), another private firm, acquired a controlling interest in TEI in exchange for approximately $28 million in cash and 3,000 shares of a newly-issued class of Sterling preferred stock. Trompeter received 1,533.48 of the shares, and Sylvia received the remainder. The value of these shares is one of the key areas of disagreement between the Estate and the Internal Revenue Service ("IRS").
 
 
 4
 Shortly before his death, Trompeter prepared Gonzalez for her role as co-executor by discussing his extensive cash, stock, and personal holdings, and introducing her to a variety of attorneys, accountants, and other professional advisors who would be able to assist her in, among other things, preparing a federal estate tax return. After Gonzalez and her sister took control over the Estate, they replaced Trompeter's longtime trusts-and-estate counsel and accountant, and assumed an active role in assisting the new professionals in their preparatory efforts.
 
 
 5
 In June 1993, the co-executors reviewed and filed the Estate's federal tax return with the IRS. The gross estate was valued at $26,422,781, and the taxable estate at $12,002,201. Shortly thereafter, various sources notified the IRS that the Estate had underpaid its tax obligations and they supplied evidence to support their allegations. In connection with his investigation, the Commissioner seized various unreported assets from a safe deposit box, including gold and silver coins, jewelry and gems.
 
 
 6
 The Commissioner subsequently determined that the Estate had knowingly underreported the taxable estate by $22,833,693, including $14 million in omitted assets, an undervaluation of the Sterling shares and some of Trompeter's gold coins, the items seized from the safe deposit box, and an improper deduction taken for a sham claim made by Sylvia Trompeter against the Estate. In addition to various deficiency penalties, the Commissioner also assessed a $14,875,909 fraud penalty pursuant to Section 6663(a) of the Internal Revenue Code.[1]
 
 
 7
 The Estate then commenced an action in Tax Court challenging the IRS' determinations. Following a lengthy bench trial, the Tax Court made findings as to the various omitted assets, valued Trompeter's rare coins, analyzed the fair market value of the Sterling stock and upheld the Commissioner's determination on this issue, and imposed a fraud penalty. Trompeter v. C.I.R., 75 T.C.M. (CCH) 1653, 1998 WL 40142 (1998).
 
 DISCUSSION
 I. Standard of Review
 
 8
 We review the Tax Court's factual determinations, including valuation of assets and findings regarding fraudulent behavior, for clear error. See Boyd Gaming Corp. v. Comm'r, 177 F.3d 1096, 1098 (9th Cir.1999). In drawing its conclusions, however, the Tax Court is obligated to detail its reasoning. Notably, as we held in Leonard Pipeline Contractors v. Comm'r, 142 F.3d 1133 (9th Cir.1998):
 
 
 9
 [I]t is the obligation of the Tax Court to spell out its reasoning and to do more than enumerate the factors and leap to a figure intermediate between petitioner's and the Commissioner's.... A reasoned decision as to what is reasonable in this context must bring together the disparate elements and give some account of how the judge has reached his conclusion. We have held district courts to this standard. Not less is expected from the Tax Court.
 
 
 10
 Id. at 1135-36 (citations omitted). Indeed, we have not hesitated to remand cases to the Tax Court when its written findings regarding valuation are somewhat inscrutable. See, e.g., Estate of Mitchell v. Comm'r, 250 F.3d 696, 703-04 (9th Cir. 2001); Estate of Magnin v. Comm'r, 184 F.3d 1074, 1081 (9th Cir.1999).
 
 
 11
 With these standards in mind, we turn to those Tax Court findings that the Estate challenges on appeal.
 
 II. Omitted Assets
 
 12
 Trompeter was a nationally-recognized collector of rare coins. Trompeter also had other valuable collections including art, artifacts, firearms, gems, jewelry, and music recordings. There is considerable dispute, and much ambiguity in the record, about the exact nature and valuation of those holdings, but the Estate concedes that it failed to report approximately $1 million in assets. Among other things, the Estate did not report the gun collection (valued at $10,000), the music collection (valued at $10,000) and some of the gems (valued at $500,000).
 
 
 13
 The IRS determined that the Estate failed to report $14 million in assets, principally art, artifacts, diamonds, jewelry, and the like. This figure was based on the estimate made by the son of one of Trompeter's acquaintances, Joe Pasko, who filed a claim against the Estate for a $1.4 million commission, alleging that Trompeter had retained him to sell assets worth at least $14 million.
 
 
 14
 Although it rejected the Estate's argument that Trompeter had gifted some of the omitted assets to the co-executors, the Tax Court did not accept the Commissioner's determination, because, among other things, the record did not disclose all of the unreported assets, nor was Pasko conversant with the full extent of Trompeter's holdings. The court did, however, conclude that there were unreported assets:
 
 
 15
 Following our detailed review of the record, we find that the estate failed to report $4.5 million of assets (inclusive of the approximately $1 million amount conceded by the estate).
 
 
 16
 Trompeter, 75 T.C.M. at 1665 (emphasis added).
 
 
 17
 The difficulty with this finding is that it is so conclusory as to make it unreviewable. The Tax Court did not specify which portions of the trial record it referenced, detail the methodology it used to arrive at its conclusion, list the omitted assets, or even offer a description of the items.
 
 
 18
 We can understand and review the basis for rejecting the $14 million figure. Unfortunately, it is the alternative finding that leaves us hanging. The convenient shorthand reference to "a detailed review of the record" only tells us, based on the length of the record, that the court spent considerable time scrutinizing it. We do not doubt the court's sincerity or diligent review. Rather, we simply do not have any factual findings that can be adequately reviewed for clear error. How did the Tax Court arrive at the $3.5 million figure? What items comprise the $3.5 million in omitted assets?
 
 
 19
 In declining to detail the assets with some reasonable specificity, the Tax Court places us in the untenable position of either abdicating our reviewing role or sifting through a voluminous record to construct a plausible account of the missing assets. Although the latter exercise may be theoretically possible, it is not an exercise to be performed by the court of appeals. See, e.g., Estate of Mitchell, 250 F.3d at 704 ("[T]he Commissioner offers us a multitude of avenues through which one might arrive at a 35 percent combined discount. This strained effort, in and of itself, is the most telling evidence of the inadequacy of the Tax Court's explanation."); see also Akers v. Comm'r, 798 F.2d 894, 897 (6th Cir.1986) ("Unlike the original judgment of Solomon, the true rationale of which has been readily apparent to generations of disinterested observers — if not, at first blush, to both of the maternal litigants — the judgment appealed from here has no discernible logic. We are not prepared to permit the Tax Court, whenever it disagrees with the valuations offered by both sides, simply to shut its eyes and pick at random any number that happens to lie somewhere between the Commissioner's valuation and the taxpayer's.").
 
 
 20
 It is, therefore, not sufficient to say that the value of various unspecified collections of art, artifacts, gems, etc., is $3.5 million. Consequently, consistent with our holding in Leonard Pipeline, we instruct the Tax Court on remand to provide sufficiently detailed findings regarding the assets (including their valuation) that were omitted from the Estate's federal estate tax return.
 
 III. The Sterling Stock Valuation
 
 21
 The Estate also challenged the Sterling stock valuation. The relevant valuation date is September 18, 1992 (the Estate's alternate valuation date). The wide disparity in valuations underscores the importance of documenting this determination. On its filed tax return, the Estate listed the 1,533 shares at $10 per share, for a total of $15,335, even though its accountant valued the shares at $462,000 only a month earlier. Just a year following the September 1992 valuation date, Sterling effected a redemption of the stock for $1,947,845 (including interest); the Commissioner adopted this later figure as the fair market valuation. Rejecting both of these valuations, the Tax Court concluded that the value was approximately $2,708,536.
 
 
 22
 The key to the stock valuation lies in the nature of this preferred stock. As a condition of the purchase agreement, Sterling was required to redeem the shares held by Trompeter and Sylvia by December 31, 1995. Among other things, the agreement contemplated that Sterling would use its "best efforts" to make payment — at the price of $1,000 per share plus "accrued dividends"[2] — for 1,000 of the shares on December 31, 1991, and an additional 1,000 shares the following year. If Sterling elected, however, to forego redemption during those years, Sterling was required to redeem 1,000 shares per year from 1993-95. Sterling was not permitted to make redemptions or dividend payments if it had, among other things, defaulted on its senior debt obligations. As of September 18, 1992, Sterling had elected not to make payment for any of the newly-issued preferred shares; although Sterling suffered some financial difficulties during the period when Trompeter owned the shares, it did have a positive cash flow dating back to 1989 — the year of the purchase agreement — and timely paid both the principal of and interest on its senior debt obligations.
 
 
 23
 In October 1993, Sterling proposed to redeem all of the Estate's preferred holdings at the price of $1,000 per share, plus, in lieu of the "accrued dividends" formulation set forth in the purchase agreement, interest that had accrued at a rate of five percent dating back to the shares' issuance to Trompeter. The co-executors of the Estate accepted the offer in January 1994, and the Estate consequently received $1,947,845 ($1,533,482 for the shares, plus $414,363 in interest).
 
 
 24
 At trial, the Commissioner argued that stock should have been valued at $1,947,845 — the redemption amount — and, supposedly, a fair market value as of September 1992. The Estate countered that the January 1994 redemption was irrelevant to the valuation of the stock in September 1992, because it was not foreseeable in light of Sterling's prior financial condition.
 
 
 25
 The Estate offered an expert who valued the stock based on comparable publicly-traded companies. The Tax Court, after an analysis of the comparable companies and Sterling's financial status, rejected the Estate's analysis, in large part because of major shortcomings in the comparability analysis. On this point the Tax Court's rationale is clear and its findings are well-grounded and not clearly in error.
 
 
 26
 The Tax Court then went on to reject the Commissioner's position that the redemption price in January 1994 was equivalent to fair market value some sixteen months earlier on September 18, 1992. The court concluded, however, that the "mandatory obligation to redeem the stock... does establish a benchmark for determining the applicable value" and that it was foreseeable in September 1992 "that Sterling would redeem the Sterling preferred stock" by December 1995 at or about the purchase agreement price. Using the benchmark figure, the court analyzed value based on a hypothetical willing buyer and seller scenario. We can easily follow and document the court's analysis and findings. So far, so good.
 
 
 27
 The court then stated, without elaboration, that it would apply a "reasonable discount rate of 4 percent" to the various interim figures to ascertain present value on September 18, 1992. Once again, we are left without the benefit of reasoning or analysis as to how the four-percent discount figure was chosen. The Tax Court did not specify why it elected to discount the payments at a four-percent rate — and why such a rate was "reasonable." The discount figure is significant because it is determinative of whether the Estate has met its burden in challenging the Commissioner's fair market value determination.
 
 
 28
 Under the applicable statutory provisions, the Estate is permitted to value the stock either as of the date of Trompeter's death or on the alternate evaluation date six months after his death. Internal Revenue Code § 2032(a). Here, the Estate elected the latter; using that date as a benchmark, the Tax Court discounted anticipated future payments to the Estate using what it described as "well accepted present value formulae." This conclusory approach, however, fails to provide a reasoned basis as mandated by Leonard Pipeline. The Tax Court did not explain why a hypothetical purchaser of Sterling preferred stock in 1992 would accept a four-percent discount rate as "reasonable." See Estate of Mitchell, 250 F.3d at 704 ("Because the [discount] range is unsupported by the testimony of any of the experts, singularly or together, it is unclear whether the Tax Court's combined discount actually falls within any particular range that might be supported in the record."). On its face, it seems a bit of a stretch to conclude that a buyer would have accepted a discount rate of only four percent to account for the time value of money and the risk that Sterling would not meet its contractual obligations.
 
 
 29
 On remand, therefore, we direct the Tax Court to clarify its methodology, and to document the rationale for its present value calculations.
 
 IV. Fraud Penalty
 
 30
 The Estate also challenges the Tax Court's finding that the Estate engaged in fraudulent practices that subject it to a penalty.
 
 
 31
 Section 6663 imposes a 75-percent penalty for any underpayment of tax that is linked to fraud. In pertinent part, the statute reads as follows:
 
 
 32
 (a) Imposition of penalty
 
 
 33
 If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.
 
 
 34
 (b) Determination of portion attributable to fraud
 
 
 35
 If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud.
 
 
 36
 "[F]raud is intentional wrongdoing on the part of the taxpayer with the specific intent to avoid a tax known to be owing." Conforte v. Comm'r, 692 F.2d 587, 592 (9th Cir.1982). The Tax Court may infer that a taxpayer engaged in fraudulent conduct by determining the existence of certain "badges of fraud," including the following: "(1) understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealing assets; and (6) failure to cooperate with tax authorities." Bradford v. Comm'r, 796 F.2d 303, 307-08 (9th Cir. 1986) (citations omitted).
 
 
 37
 We note that although the Tax Court found fraud based on four of the above-enumerated "badges" (understatement of income, implausible or inconsistent explanation of behavior, concealing assets, and failure to cooperate with tax authorities), this determination rested in part on now-vacated findings related to omitted assets and the Sterling stock. In light of this posture, it is appropriate for the Tax Court to consider on remand, after it makes the requisite findings and clarifications, whether it is necessary to revisit its conclusions regarding fraud. In directing this approach, we do not pass judgment on the Tax Court's multiple, careful, and well-documented findings in this arena, nor do we suggest that a remand will necessarily result in a different outcome with respect to fraud.
 
 
 38
 Finally, it bears noting that we do not necessarily countenance the various arguments that the Estate makes in support of its argument that the Tax Court's fraud findings are clearly erroneous. In particular, we reject the Estate's suggestion that blind reliance on an accountant's valuation is sufficient per se to avoid fraud. Indeed, were that the case, experts for hire would serve as an ironclad defense in tax fraud cases. Although it may be reasonable in some circumstances for a taxpayer to rely on an accountant's advice about the intricacies of tax law, see, e.g., United States v. Boyle, 469 U.S. 241, 251, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985), that presumption only attaches to valuations when the taxpayer "exercises due care in obtaining an appraisal of fair market value" and presents "some proof in support of the asserted" valuation. Sammons v. Comm'r, 838 F.2d 330, 337 (9th Cir.1988) (internal quotation marks and citations omitted). Here, the Tax Court appropriately noted that Trompeter's daughters are well-educated, sophisticated, and knowledgeable about various of the Estate's holdings, and thus should not have blindly accepted expert conclusions at face value — especially when those conclusions may have been contradicted by other appraisals prepared by the Estate. See, e.g., Hildebrand v. Comm'r, 967 F.2d 350, 353 (9th Cir.1992) (holding, in the context of affirming negligence penalties under Internal Revenue Code § 6653(a), that having returns prepared by Coopers & Lybrand was not sufficient to demonstrate exercise of "due care" when the taxpayers had engaged in "a transaction which clearly lacked economic substance, and which was designed to produce tax benefits out of proportion with total investment.").
 
 CONCLUSION
 
 39
 We vacate the Tax Court's decision and remand for further proceedings consistent with this opinion.
 
 VACATED and REMANDED
 
 
 Notes:
 
 
 *
 This case was argued telephonically
 
 
 [1]
 The fraud penalty represents 75-percent of the Estate's deficiency. In lieu of a finding of fraud, the IRS determined that the Estate would alternatively be subject to penalties for negligence and gross valuation misstatements pursuant to Section 6662 of the Internal Revenue Code
 
 
 [2]
 The dividends accrued between 1989 and 1992 at an annual rate ranging from 8.5 to 12.5 percent. The purchase agreement stipulated that to the extent that Sterling decided not to pay accrued dividends, those dividends would be added to the liquidation value of the shares