T.C. Memo. 2005-18

UNITED STATES TAX COURT

SAM F. FORD AND INGRID D. FORD, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4691-99.                    Filed February 1, 2005.

<u>Kenneth G. Gordon</u> and <u>Mortimer L. Laski</u>,[1] for petitioners.

<u>Shirley M. Francis</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  Petitioners petitioned the Court to
redetermine a $998,754 deficiency in their 1986 Federal income
tax, a related $749,066 addition to tax under section

_____

    [1] <u>Mr. Gordon</u> and <u>Mr. Laski</u> entered the case on Oct. 2, 2002.
<u>Joseph M. Wetzel</u>, <u>Russel A. Sandor</u>, <u>Michael C. Wetzel</u>, and <u>Darin
Christensen</u> entered the case on Apr. 30, 1999, on petitioners'
behalf, but withdrew on Oct. 4, 2002.

6653(b)(1)(A), and a related time-sensitive addition to tax under section 6653(b)(1)(B).[2]  In an amended answer, respondent asserted an increase in the deficiency of $560,000, a related $420,000 addition to tax under section 6653(b)(1)(A), and a related time-sensitive addition to tax under section 6653(b)(1)(B).

We must decide the following five issues as to 1986:

1.  Whether respondent arbitrarily or erroneously determined that petitioners failed to report net capital gains of $2,341,878.  We hold that he did not;

2.  whether petitioners failed to report other income of $2.8 million from the sale of securities.  We hold that they did;

3.  whether petitioners are liable for additions to tax under section 6653(b)(1)(A) and (B), and, if so, whether section 6501(c)(1) applies to annul the 3-year period of limitations under section 6501(a)(1).  We hold that they are and that section 6501(c)(1) annuls the 3-year period of limitations;

4.  whether respondent's determination is barred by judicial or equitable estoppel.  We hold that it is not; and

5.  whether petitioner Ingrid Doorn Ford (Ms. Ford) is entitled under section 6015(b) to full or apportioned relief from

---

[2] Unless otherwise indicated, section references are to the Internal Revenue Code applicable to the relevant years, and Rule references are to the Tax Court Rules of Practice and Procedure.

joint and several Federal income tax liability. We hold that she is not.

FINDINGS OF FACT

I. Overview

Some facts are stipulated. We incorporate herein by this reference the parties' stipulations of fact and the exhibits submitted therewith. We find the stipulated facts accordingly.

Petitioners resided in Eugene, Oregon, when their petition was filed in this Court. They timely filed a 1986 joint Federal income tax return (1986 return). Sam F. Ford (Mr. Ford) has one child, Marc J. Ford (Marc Ford), who lives in Chicago, Illinois. Ms. Ford was born in Indonesia but has lived in the United States since 1960. She has no children.

In 1983, Ms. Ford worked as a secretary and bookkeeper at International Tillex in New York, New York, a business owned by her cousin, Robert Doorn (Mr. Doorn). While there, she exercised a stock option for $32,500 of International Tillex shares, which she sold at a profit. She also had a brokerage account with Yorkton Securities, Inc. She met Mr. Ford during 1983, and they married on February 7, 1986. During the early months of their marriage, petitioners rented a house in Beverly Hills, California. In 1986, Mr. Ford was self-employed.

II.  Mr. Ford's Background

Mr. Ford was convicted of securities fraud in 1968, and he was convicted of mail fraud in 1978.  He served 3 years in prison for the second conviction and was released from Allenwood Federal Prison in September 1981.  Approximately 8 months before his release, on February 21, 1981, Mr. Ford was ordered to disgorge $250,000 to the Securities and Exchange Commission (SEC).  The court directed that the $250,000 be paid in installments as Mr. Ford was financially able.

In 1986, while trying to renegotiate his payments to the SEC, Mr. Ford concealed assets and income from the SEC by placing assets in the names of his wife and son.  Mr. Ford represented to the SEC that he owned no stocks or bonds, that he had gross income of $16,000 in 1985, that he had a net worth of negative $560,000 throughout 1985 and 1986, and that he was unemployed and trying to avoid filing for bankruptcy.  Each of these statements was false.

Subsequently, Mr. Ford was charged with two felonies. First, Mr. Ford was charged under 18 U.S.C. section 1001 (2000) with making false statements to the SEC.  Second, Mr. Ford was charged under section 7206(1) with filing a false tax return for 1986.  He pled guilty on November 15, 1990, to both of these felonies.  In an allocution incident to this plea that he made under oath and while represented by counsel, Mr. Ford stated:

> In * * * [petitioners'] 1986 federal personal income tax return, I failed to include income in excess of $2.8 million I had received from the sale of securities belonging to me which I had secreted in accounts in the name of my son and others. The income, however, was reported on my son's 1986 personal tax return and the tax was fully paid through him. I had arranged for the income to be reported on his income tax return specifically to conceal my earnings * * * In short, when I filed my 1986 federal personal income tax return, I willfully made a return * * * knowing that the return was not true and correct as to material matters.

III. <u>Canadian Stock Transactions</u>

Mr. Ford's criminal conviction had its genesis in the early 1980s, when Mr. Ford purchased and sold International Tillex stock through Canadian brokerage accounts which were owned by at least seven nominee corporations, namely: (1) For Door Investments, Ltd.; (2) Pooh Bear Investments, Ltd.; (3) Bear & Pebbles Investments, Ltd.; (4) Canadian American Aquafarms International, Ltd.; (5) Solar Aquafarms, Ltd.; (6) Toronado Resources; and (7) Blackbird Investments. Ostensibly, these nominee corporations were owned by either Ms. Ford or Marc Ford, but in reality, they were controlled by Mr. Ford. Each of these nominee corporations traded in shares of International Tillex and, later, Beverly Development. These nominee corporations received income totaling more than Can$ 8 million from trading in

International Tillex stock.[3]  No taxes were paid by anyone on this income.

Mr. Ford initially owned 69,111 shares of International Tillex stock, which he held in a brokerage account in the name of Marc Ford.  Mr. Ford sold those shares at a profit.  Subsequently, but prior to his marriage, Mr. Ford invested another $26,000 in shares of International Tillex.  Mr. Ford owned these shares through accounts in the name of Marc Ford and Ms. Ford (using her maiden name of Doorn).

IV.  Petitioners' Control of the Nominee Brokerage Accounts

Mr. Ford, through his assistant Linda Hazlett, who acted under his direction and control, set up and controlled Blackbird Investments and its corporate trading account.  Ms. Ford purchased a house in Montecito, California, in 1986, and funds from a Blackbird Investments account were pledged as security for the purchase loan.  Approximately $25,000 was also taken from a Toronado Resources account for a downpayment.  At the time of the purchase, Blackbird Investments had a brokerage account in Canada which traded in International Tillex stock.  On June 12, 1986, an additional $250,000 was wired into Ms. Ford's bank account in

---

[3] Blackbird Investments, for example, received more than $2 million (Canadian) from trading in International Tillex stock, and Toronado Resources received income of approximately $1.2 million (Canadian) from trading in International Tillex.

California for the purpose of making home improvements and buying home furnishings.

Mr. Ford received $1,750,000 from the Maryland Bank in Luxembourg, secured by a Blackbird Investments trading account, and from a Toronado Resources account. These funds were used for Ms. Ford's purchase of the Montecito home and to pay taxes which Mr. Ford owed from the 1970s. In March 1986, Mr. Ford also authorized a withdrawal from a Solar Aquafarms, Ltd., account, which Ms. Ford used to buy fur coats at the Pappas Fur Co. in Canada. Mr. Ford also transferred money from various Canadian corporate accounts, derived from International Tillex stock transactions, into his own bank accounts. Further, in April 1986, funds were transferred from at least one of the Canadian corporate accounts into a bank account in Beverly Hills, California, belonging to Ms. Ford.

V.   Petitioners' 1986 Return

On petitioners' 1986 return, they did not report that they had received any wages, salaries, or other compensation (e.g. self-employment income). They did not attach any Forms W-2, Wage and Tax Statement, to their 1986 return. The 1986 return did not include a Schedule C, Profit or Loss From Business. Petitioners reported taxable income of negative $275,937, stated they had no income tax liability, and requested a refund for the full amount of their estimated tax payments of $38,000. Mr. Ford knew when

petitioners were filing their 1986 return that they were not reporting all of their income.

Item 10 on Schedule B, Interest and Ordinary Dividends, asked the following question: "At any time during the tax year, did you have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)?" Petitioners responded that they did not. This was false: in addition to the Canadian brokerage accounts, petitioners each opened foreign bank accounts in 1985 at the TSB Private Bank International S.A. in Luxembourg and maintained them throughout 1986.

## VI. Respondent's Notice of Deficiency

In respondent's notice of deficiency, dated February 26, 1999, he determined that petitioners had unreported income for 1986. Specifically, respondent determined that petitioners should have reported all of the long-term and short-term capital gains and losses from the Canadian brokerage accounts in 1986, totaling $5,084,483, because Mr. Ford was the beneficial owner of the stocks traded.

## VII. Respondent's Increase in Deficiency

Respondent amended his answer in this case to assert additional unreported income of $2.8 million based on statements made under oath by Mr. Ford in his allocution quoted above as to

his failure to include income of more than $2.8 million from the sale of securities. Petitioners conceded during this case that this unreported income of more than $2.8 million was not included in the notice of deficiency.

Mr. Ford used Marc Ford's name in many of petitioners' financial transactions. During 1985 and 1986, Mr. Ford had access to bank accounts which were opened under the name of Marc Ford, and he wrote checks from those accounts. Mr. Ford owned assets in Marc Ford's name and opened brokerage accounts in Marc Ford's name. During 1986, Mr. Ford owned, in Marc Ford's name, shares of International Tillex and Beverly Development.

VIII. Ms. Ford's Financial Transactions

Ms. Ford signed many financial documents relating to these transactions, including some relating to ownership in shares of International Tillex. In 1986, she had multiple brokerage accounts and bank accounts in her name and signed documents relating to them.

During 1986, Ms. Ford purchased several items for large amounts of money. For instance, she purchased fur coats costing approximately $17,000 from the Pappas Fur Co. in British Columbia. On or about April 30, 1986, she purchased a 1986 Rolls-Royce from Gregg Motors Rolls-Royce of Beverly Hills, California, for $114,736.80, which she paid by checks in the amounts of $100,000 and $14,899.50.

Ms. Ford also transferred large sums of money among her various personal accounts during 1986. On August 11, 1986, she wrote a check for $286,000 from her personal account at Security Pacific National Bank, made payable to Security Pacific National Bank, with a notation that it was for a cashier's check. On August 27, 1986, Ms. Ford wrote another check from her Security Pacific account, this time payable to "Cash", for $346,290.78. On April 15, 1986, Ms. Ford deposited a check for $55,074 from her brokerage account at Yorkton Securities, Inc., into her account with the National Bank of Canada. On February 9, 1986, Ms. Ford wrote a check for $10,000 to Codowell S.A., in Switzerland. Less than a year after signing her 1986 return, on April 12, 1988, Ms. Ford sent a handwritten letter to the managing director of the TSB Private Bank International S.A., in Luxembourg, requesting that $100,000 be placed in a high-yield account for her.

On or about June 19, 1986, Ms. Ford purchased a house in Montecito, California, for $1,150,000. Ms. Ford borrowed $1,150,000 from the Maryland Bank International N.A. in Luxembourg to make the purchase, signing documents for a deed of trust to the Maryland Bank. The downpayment was taken from the Canadian brokerage account of one of the nominee corporations, and the Maryland Bank loan was guaranteed by another nominee corporation's trading account. Ms. Ford made no monthly payments

as to this house during 1986.  However, on the 1986 return, petitioners claimed a deduction for home mortgage interest of $56,416 on Schedule A, Itemized Deductions.

Ms. Ford was a partner in at least one business venture. She purchased an interest in the Courtyard by Marriott Ltd. Partnership on August 1, 1986, for $200,000, comprising $30,400 in cash and a "limited partner note" of $169,600.  The 1986 return listed a $17,163 loss which had been passed through to Ms. Ford from her ownership interest in the Courtyard by Marriott Limited Partnership.

## OPINION

I.  Net Capital Gains

We decide whether respondent arbitrarily or erroneously determined that petitioners failed to recognize $2,341,878 in net capital gains in 1986 attributable to more than $5 million of capital gains for the year.  Petitioners bear the burden of proving that the amount set forth in the notice of deficiency is arbitrary or erroneous; respondent is presumed correct once he has put forth some probative evidence linking petitioners with the income-producing activity.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977).[4]

---

[4] Sec. 7491(a) was added to the Internal Revenue Code by the Internal Revenue Service Restructuring and Reform Act of 1998,
(continued...)

As a threshold matter, respondent must show some income source to support his determination. Weimerskirch v. Commissioner, supra. Here, respondent has established the existence of income from the Canadian brokerage accounts in the form of an exhibit presented at Mr. Ford's Fatico[5] hearing. This exhibit showed over $5 million in capital gains for 1986 on which no tax was paid. Respondent has also established that both petitioners controlled these accounts and that these corporations received income totaling more than Can$ 8 million from trading in International Tillex stock.

The record shows that both petitioners controlled, and received income from, the nominee corporations. Mr. Ford, through his assistant Linda Hazlett, who acted under his direction and control, set up and controlled Blackbird Investments and its corporate trading account. He and Ms. Ford received $1,750,000 from the Maryland Bank in Luxembourg, secured

---

[4](...continued)
Pub. L. 105-206, sec. 3001(c), 112 Stat. 727, effective for court proceedings arising from examinations commencing after July 22, 1998. Sec. 7491(a)(1) provides that the burden of proof shifts to the Commissioner in specified circumstances. Petitioners make no argument that sec. 7491(a)(1) applies to this case, and we conclude that it does not (as this case predates the enactment of sec. 7491(a)).

[5] In U.S. District Court, the parties are given an opportunity to present evidence with respect to sentencing. U.S. Sentencing Guidelines sec. 6A1.3 (2002). This evidentiary hearing is held before the sentencing of a convicted criminal. See United States v. Fatico, 579 F.2d 707 (2d Cir. 1978).

by the Blackbird Investments trading account, and from a Toronado Resources account. These funds were used by Ms. Ford to purchase the Montecito home and for Mr. Ford's payment of taxes owed from the 1970s. In March 1986, Mr. Ford authorized a withdrawal from a Solar Aquafarms, Ltd. account, which Ms. Ford used to buy fur coats at the Pappas Fur Co. in Canada. Mr. Ford also transferred money from various Canadian corporate accounts, derived from International Tillex stock transactions, into his own bank accounts. Further, in April 1986, funds were transferred from at least one of the Canadian corporate accounts into a bank account in Beverly Hills, California, belonging to Ms. Ford. Ms. Ford purchased a house in Montecito, California, in 1986, financed by a mortgage for which funds from a Blackbird Investments account were pledged as security. Approximately $25,000 was also taken from a Toronado Resources account for a downpayment. At the time of the purchase, Blackbird Investments had a brokerage account in Canada which traded in International Tillex stock. On June 12, 1986, an additional $250,000 was wired into Ms. Ford's bank account in California for the purpose of making home improvements and buying home furnishings. These facts show that each petitioner had control, and made frequent beneficial use, of the income in the Canadian accounts based on which respondent determined the deficiency and additions to tax stated in his notice of deficiency. The Court concludes that respondent has

met his minimal burden of establishing a source of income underlying his determination of deficiency.  See <u>Weimerskirch v. Commissioner</u>, <u>supra</u>.

Petitioners urge that we should find respondent's determination arbitrary and erroneous because respondent lost some of the evidence upon which it was based.  Petitioners' only evidence in support of their argument is their own testimony.  We do not find petitioners credible; their testimony was inconsistent and implausible, as discussed <u>infra</u>.  We hold that respondent correctly determined unreported net capital gains of $2,341,878 for 1986.

## II.  Other Unreported Income

We next decide the correctness of the increased deficiency based upon the $2.8 million of unreported income asserted by respondent in an amended answer.  Respondent bears the burden of proof on this issue.  Rule 142(a).  In support of his increase, respondent points the Court to Mr. Ford's previously quoted allocution and his testimony before this Court, both of which were under oath and made while represented by counsel.  During his allocution Mr. Ford acknowledged that he had: "failed to include income in excess of $2.8 million I had received from the sale of securities belonging to me which I had secreted in accounts in the name of my son and others".

In this Court, petitioners conceded that respondent's notice of deficiency did not include this $2.8 million.  While petitioners now claim in their brief that respondent erred in calculating this amount, we conclude to the contrary.  Mr. Ford's words, which were spoken under oath on at least two occasions while represented by counsel, are clear and unambiguous.  We conclude that petitioners failed to report this other $2.8 million from the sale of securities.[6]

III. Fraud

We decide whether petitioners are liable for the above-mentioned additions to tax for fraud under section 6653(b)(1)(A) and (B).[7]  Respondent must prove his determination of fraud by

---

[6] Our decision as to this $2.8 million and the approximately $5 million above is also consistent with our finding that the nominee corporations controlled by petitioners failed to recognize income totaling more than Can$ 8 million.

[7] In relevant part, sec. 6653(b) provides:

   (1) In general.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to the sum of--

   (A) 75 percent of the portion of the underpayment which is attributable to fraud, and

   (B) an amount equal to 50 percent of the interest payable under section 6601 with respect to such portion for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax or, if earlier, the date of the
                                                    (continued...)

clear and convincing evidence.  See sec. 7454(a); Rule 142(b);

Rowlee v. Commissioner, 80 T.C. 1111, 1113 (1983).  Respondent

must prove that petitioners fraudulently intended to underpay

their tax.  See Powell v. Granquist, 252 F.2d 56 (9th Cir. 1958);

Miller v. Commissioner, 94 T.C. 316, 332-333 (1990).  Respondent

must meet his burden through affirmative evidence because fraud

is never imputed or presumed.  See Beaver v. Commissioner, 55

T.C. 85, 92 (1970).  Whether fraud exists in a given situation is

a factual determination that must be made after reviewing the

particular facts and circumstances of the case.  DiLeo v.

Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir.

1992).

If respondent establishes that some part of an underpayment

was due to fraud, the entire underpayment is treated as

attributable to fraud unless petitioners prove otherwise.  Sec.

---

[7](...continued)
payment of the tax.

> (2)  Determination of portion attributable to fraud.
> If the Secretary establishes that any portion of an
> underpayment is attributable to fraud, the entire
> underpayment shall be treated as attributable to fraud,
> except with respect to any portion of the underpayment
> which the taxpayer establishes is not attributable to
> fraud.

> (3)  Special rule for joint returns.  In the case of
> a joint return, this subsection shall not apply with
> respect to a spouse unless some part of the underpayment
> is due to the fraud of such spouse.

6653(b)(2).  The fraud penalty may be applied against a spouse only where some part of the underpayment is due to the fraud of the spouse.  Sec. 6653(b)(3).

A.   Underpayment of Tax

Mr. Ford has acknowledged under oath and while represented by counsel that petitioners' 1986 return does not report all of their income for 1986 and that this unreported income was subject to significant Federal income tax.  This testimony conclusively establishes the existence of a knowing underpayment by petitioners.  See Considine v. United States, 683 F.2d 1285, 1287 (9th Cir. 1982).

B.   Intent To Evade Tax

Fraudulent intent may be proven by circumstantial evidence because direct proof of a taxpayer's intent is rarely available. Reasonable inferences may be drawn from the relevant facts. Spies v. United States, 317 U.S. 492, 499 (1943); Stephenson v. Commissioner, 79 T.C. 995 (1982), affd. 748 F.2d 331 (6th Cir. 1984).  Fraud requires a clear and convincing showing that the taxpayer intended to evade a tax known or believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of tax.  Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968).  While a conviction under section 7206(1) does not, in and of itself, establish fraudulent intent, it is a factor from which we "may properly infer fraud" where it is

combined with other badges of fraud.  <u>Considine v. United States</u>, <u>supra</u>; <u>Estate of Rau v. Commissioner</u>, 301 F.2d 51 (9th Cir. 1962), affg. T.C. Memo. 1959-117.

We often rely on certain indicia of fraud in deciding the existence of fraud.  The presence of several indicia is persuasive circumstantial evidence of fraud.  <u>Beaver v. Commissioner</u>, <u>supra</u> at 93.  The badges of fraud include:  (1) Understatement of income, (2) maintenance of inadequate records, (3) failure to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of income or assets, and (6) failure to cooperate with tax authorities.  <u>Spies v. United States</u>, <u>supra</u>; <u>Estate of Trompeter v. Commissioner</u>, 279 F.3d 767, 773 (9th Cir. 2002), vacating and remanding 111 T.C. 57 (1998); <u>Bradford v. Commissioner</u>, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601.  We discuss each of the badges as it may relate to our case.

1.  <u>Understatement of Income</u>

Understating income is indicative of fraudulent intent. <u>Bradford v. Commissioner</u>, <u>supra</u>.  The existence of an understatement of income was clearly and convincingly established by Mr. Ford's guilty plea, by his testimony in both his criminal case and in this case, and by our findings concerning petitioners' unreported taxable income for 1986.  The evidence

also establishes that Ms. Ford played an integral part in this understatement of income.

Ms. Ford testified that she had no knowledge of the understatement, but she owned several of the nominee corporations at issue in this case. She also recognized the corporate names of Pooh Bear Investments, Ltd.; Bear & Pebbles Investments, Ltd.; For Door Investments, Ltd.; and Solar Aquafarms, Ltd. Ms. Ford's recognition of these names and their history (she testified that For Door was a combination of the names Doorn and Ford, and that Pooh Bear as well as Bear & Pebbles was named for petitioners' dogs) makes her testimony that she had no knowledge of Mr. Ford's activities less than credible. The Court concludes that Ms. Ford had knowledge of, and involvement in, the fraudulent financial transactions of 1986. This factor weighs against petitioners.

2. <u>Maintenance of Inadequate Records</u>

Lack of records is indicative of fraudulent intent. <u>Id.</u> Mr. Ford acknowledged during his testimony in this case that petitioners kept few records as to the subject transactions. The "records" in this case consist of handwritten letters, some canceled checks, a few banking records from domestic and international accounts, and a stock option exercise agreement by Ms. Ford. Those records show direct control and management of the Canadian accounts by both petitioners.

This factor weighs against petitioners.

3.   Failure To File a Tax Return

Failing to file tax returns is indicative of fraudulent intent.  Bradford v. Commissioner, supra.  Although petitioners did file a 1986 tax return, the mere filing of that return does not necessarily weigh in favor of petitioners.  Where, as here, the return was admittedly filed with an understatement of income and requested a full refund of the $38,000 paid in estimated taxes, this factor weighs against petitioners.

4.   Implausible or Inconsistent Explanations of Behavior

Giving implausible or inconsistent explanations of behavior is indicative of fraud.  Id.  Mr. Ford testified before this Court that the Canadian accounts held money owned by Mr. Doorn. The record, however, shows that Mr. Ford controlled the accounts in question and repeatedly received financial benefit from them, by his own admission taking up to $1 million in 1986.  This sum was never repaid, and there was never an accounting between petitioners and Mr. Doorn.  The Court finds his explanation implausible, because the evidence establishes petitioners' ownership and control of the Canadian money.

Ms. Ford claimed that she did not even notice petitioners' negative income on their tax return when she signed it.  This is not credible given her expenditures in 1986:  she wrote over $600,000 in checks to cash, purchased a $1.15 million home, purchased a Rolls-Royce automobile, and purchased $17,000 in

Canadian furs.  Ms. Ford testified she did not know why the house in Montecito was titled only in her name, but it was, and she signed multiple documents to make it so.  She also claimed to have no knowledge as to where she found the money to buy the house in Montecito or whether she borrowed money from the Maryland Bank in Luxembourg.  In fact, she personally signed a mortgage on the Montecito home with the Maryland Bank in Luxembourg.

Ms. Ford testified that she does not know where she found the money to write a check to cash for $346,290.78, or how the cash was used.  When asked whether the amount of $346,290.78 was wired to her domestic bank account from an account at the Maryland Bank in Luxembourg, she responded that it was possible, but she could not recall.  She testified that she did not remember whether in 1986 she had an account with the Maryland Bank in Luxembourg, or whether she had money wired to her from overseas, but the evidence shows she was involved in international money transfers in that year, at least one of them from her personal trading account at Yorkton Securities, Inc., into her personal bank account in California.  Ms. Ford testified that she does not recall having worked for International Tillex in 1985, having exercised an International Tillex stock option while there, or even what a stock option is.  After she was shown a copy of a Tillex option agreement she signed on August 20,

1984, she testified that she did not recall a relationship with the company. She further claimed that she was not aware of Mr. Ford's criminal charges until sometime after his <u>Fatico</u> sentencing hearing.

Ms. Ford testified that she did not read the question on Schedule B of the return which asked whether she had an interest in, or signature or other authority over, a foreign bank account, and she could not confirm whether the question was answered truthfully. The record evidence shows that she did have several bank and brokerage accounts overseas in 1986, and she even admitted in testimony that she had a bank account at TSB Private Bank International S.B. in Luxembourg. Ms. Ford's testimony was not truthful. She testified, under oath, that she had no financial experience, but she did. She testified under oath that she never looked at anything her husband gave her to sign, but she did—she later admitted that she knew the names of the nominee corporations and even from where they were derived. She stated on the 1986 return that she had no overseas bank accounts, but she did. The Court finds Ms. Ford's testimony inconsistent and implausible because her claims of ignorance are not credible when viewed against her complex and numerous financial dealings in 1986.

This factor weighs against petitioners.

5. <u>Concealment of Income or Assets</u>

Concealing income or assets is indicative of fraud. <u>Bradford v. Commissioner</u>, 796 F.2d 303 (9th Cir. 1986). Mr. Ford admitted under oath that he "secreted" securities belonging to him "in accounts in the name of my son and others." Further examination by respondent uncovered money hidden in Canadian brokerage accounts which respondent determined belonged to petitioners. Ms. Ford played a critical role in Mr. Ford's concealment of assets, taking sole title to their Montecito home and to their Rolls-Royce. She also was listed as the owner of several of the nominee corporations at issue, and she owned in her own name many investments, including shares of International Tillex. Had these assets been owned by Mr. Ford, he would have been unable to represent to the SEC that he owned no stocks or bonds, that he had gross income of $16,000 in 1985, that he had a net worth of negative $560,000 throughout 1985 and 1986, and that he was unemployed and trying to avoid filing for bankruptcy.

On the basis of Mr. Ford's own testimony and upon the evidence before the Court, the Court concludes that petitioners concealed assets from the SEC and from respondent.

Ms. Ford played a sophisticated role in petitioners' concealment of assets; she was not financially naive. Her testimony to the contrary is flatly contradicted by all the evidence before this Court. In 1986, she was a business partner

in the Courtyard by Marriott Limited Partnership, a personal investment which indicates some business knowledge on her part. That same year, she received money from her Yorkton Securities, Inc. brokerage account and deposited it into her personal bank account. She also took title to, and paid for, a Rolls-Royce and $17,000 in Canadian furs, and she wrote a cashier's check and a check to cash totaling over $600,000. These transactions establish that Ms. Ford personally benefited from the fraudulent scheme of which she now claims utter ignorance. She sent a handwritten letter to an international banker in Luxembourg less than a year after she signed the fraudulent return, instructing him in detail to open an overseas bank account in her name. Such evidence of actions subsequent to the act at issue is admissible where it shows knowledge, intent, or absence of mistake. Fed. R. Evid. 404(b); Huddleston v. United States, 485 U.S. 681 (1988) (the conditional relevancy of subsequent acts is determined by a preponderance of the evidence); United States v. Olivo, 69 F.3d 1057 (10th Cir. 1995) (conditionally relevant evidence that criminal defendant, charged with possession of marijuana with intent to distribute, still had some marijuana in his car over a year after the alleged crime, held admissible). The Court concludes that Ms. Ford was directly involved in the financial transactions of 1986 and finds her testimony to the contrary not credible.

This factor weighs against petitioners.

6. Cooperation With Authorities

Failure to cooperate with authorities is indicative of fraud. Mr. Ford was less than forthcoming with the SEC, and we do not find any evidence that petitioners were helpful in reconstructing the transactions underlying respondent's notice of deficiency. We find this factor weighs against petitioners.

7. Conclusion

On the basis of the above analysis, we find that all of the badges of fraud weigh against both petitioners. We therefore conclude that petitioners intended to evade tax known or believed to be owing.

C. Portion of Underpayment Attributable to Fraud

Respondent has proven clearly and convincingly that a portion of petitioners' underpayment is attributable to fraud. Thus, the whole underpayment is attributable to fraud, except to the extent petitioners prove otherwise. Sec. 6653(b)(2). Petitioners testified that Mr. Doorn and other unnamed Europeans owned the money in the Canadian accounts. Mr. Ford allegedly viewed his role as that of an "agent" for the Europeans, and testified that his only interest in the Canadian accounts was a 50-percent profit participation once the Europeans' original investment was recouped. Thus, he testified, the moneys which petitioners used from these accounts were "loans" repayable to

Mr. Doorn and the Europeans. Mr. Ford admitted under oath and while represented by counsel that petitioners have no documents or other evidence to support these assertions. He attempted to rationalize this lack of records by saying that "it was family. It was informal".

Contrary to Mr. Ford's testimony, the evidence shows a consistent pattern of ownership and control of these funds by both petitioners as discussed above. At trial, Mr. Ford testified that he received at least a few hundred thousand dollars, and perhaps as much as a million dollars, in purported "loans" from the Canadian accounts, which he admittedly never repaid. He also testified that there was never an accounting between petitioners and Mr. Doorn. Petitioners did not call Mr. Doorn, Marc Ford, or any of their accountants as witnesses. It is well established that the failure of one party to introduce evidence within his or her possession leads to the inference that the information if produced would be favorable to the opposing party. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947); see also McKay v. Commissioner, 89 T.C. 1063, 1069 (1987) (failure of witness to testify to fact peculiarly within his knowledge suggests that testimony would have been unfavorable), affd. 886 F.2d 1237 (9th Cir. 1989). On the basis of this evidence and his lack of credibility while testifying, the Court is not persuaded

by Mr. Ford's testimony and finds that petitioners have failed to show that any of the underpayment of tax was not due to fraud.

D.   Period of Limitations Under Section 6501(c)

After a return is filed, the Commissioner generally has 3 years within which to assess a deficiency in a civil tax case. Sec. 6501(a)(1).  However, in the case of a false or fraudulent return that is filed with the intent to evade tax, the tax may be assessed at any time.  Sec. 6501(c).  Since we conclude that petitioners' 1986 return was such a return, we also conclude the period for assessment remains open.  Id.; see also Considine v. United States, 683 F.2d at 1288.

IV.  Estoppel

Petitioners urge in their opening brief that the Court apply judicial or equitable estoppel to overturn respondent's determination.  Neither estoppel argument is timely presented. Rule 39 requires that all affirmative defenses be set forth in the pleadings.  Fazi v. Commissioner, 105 T.C. 436, 444-446 (1995).  Rule 34(b)(4) requires that concise assignments of error be stated in the initial pleadings for each error asserted and states that any issue not raised in the assignments of error shall be deemed to be conceded.  Because petitioners have failed

properly to raise the issue of judicial or equitable estoppel, we decline to allow them to raise it now.[8]

V.  Section 6015(b) Relief

Ms. Ford requests section 6015(b) relief from joint and several liability.  Spouses filing a joint Federal income tax return are generally jointly and severally liable for the tax shown on the return or found to be owing.  Sec. 6013(d)(3); Butler v. Commissioner, 114 T.C. 276, 282 (2000).  In certain cases, however, an individual filing a joint return may avoid joint and several liability for tax (including interest, penalties, and other amounts) by qualifying for relief under section 6015.  The three types of relief prescribed in that section are:  (1) Full or apportioned relief under section 6015(b) (full or apportioned relief), (2) proportionate relief under section 6015(c) (proportionate relief), and (3) equitable relief under section 6015(f) (equitable relief).  Ms. Ford claims entitlement only to relief under section 6015(b).  Ms. Ford bears

---

[8] Petitioners would still not prevail even if these issues were properly before us.  Contrary to petitioners' assertions on this issue, the fact that Marc Ford may have paid tax on the referenced $2.8 million does not mean that respondent is estopped from determining the $2.8 million is rightfully taxed to petitioners.  Nor would a finding that petitioners were "prevented" by respondent's actions from filing an amended return for 1986, on which they would have reported the disputed income, serve to estop respondent from now asserting fraud.  A taxpayer who files a fraudulent return does not purge the fraud by a subsequent voluntary disclosure.  Badaracco v. Commissioner, 464 U.S. 386, 394 (1984).

the burden of proving that claim.  See <u>Alt v. Commissioner</u>, 119 T.C. 306, 311 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004); see also Rule 142(a)(1).

Section 6015(b) provides relief from joint and several liability to the extent that the liability is attributable to an understatement of tax.  To be eligible for this relief, a requesting spouse needs to satisfy the following five elements of section 6015(b)(1):

> (A) a joint return has been made for a taxable year;
>
> (B) on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;
>
> (C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;
>
> (D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and
>
> (E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection * * *.

The requesting spouse's failure to meet any one of these requirements prevents him or her from qualifying for section 6015(b) relief.  <u>Alt v. Commissioner</u>, <u>supra</u> at 313.

Respondent concedes that the elements of subparagraphs (A) and (E) have been satisfied and focuses on the remaining subparagraphs.  Respondent argues that Ms. Ford meets none of

these requirements.  We consider only the second of these three subparagraphs because we agree with respondent that its requirements have not been met.

We conclude that Ms. Ford knew or had reason to know of the 1986 underpayment at the time she signed the return so as to be precluded from receiving her requested relief under section 6015(b).  Credible evidence shows that Ms. Ford was intimately involved in the convoluted financial transactions which transpired in 1986, that she played a crucial role in the utilization of nominee corporations and brokerage accounts, and that she played a crucial role in the concealment of assets acquired in 1986, as previously discussed.

The previously discussed inconsistencies in her testimony, piled one upon the next, also make her testimony not credible to the Court.

_____

All of the parties' arguments have been considered.  We have rejected as meritless those not discussed herein.  Accordingly,

Decision will be entered

under Rule 155.